**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alvin Leon EDWARDS,**
**Defendant-Appellant.**

**No. 76–1668.**

United States Court of Appeals,
Fifth Circuit.

June 27, 1977.

Rehearing En Banc Granted Aug. 24, 1977.

**1332**

H. Gilman Hudnall, Jr., Atlanta, Ga. (Court appointed), for defendant-appellant.

John W. Stokes, U. S. Atty., William F. Bartee, Jr., Dorothy T. Beasley, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

Alvin Leon Edwards appeals from his conviction in a jury trial of possessing two checks knowing them to have been stolen from the mails. 18 U.S.C. § 1708. He claims that the search that uncovered the checks violated the fourth amendment and that he was denied a speedy trial. The government seeks to justify the search as based on probable cause coupled with exigent circumstances, as incident to an arrest, and as part of a routine inventory procedure for cars that are to be impounded. We reject each theory and reverse the conviction.

I.

On May 1, 1974 police officer M. L. Williams received a call to a government housing project in Atlanta's west end. He arrived at the address and spoke to Mary McVickers, family service officer of the large apartment complex. She gave Williams a description of three persons who had allegedly been stealing checks from mail boxes: two black females with afro hair styles, one wearing a white blouse and orange pants, the other wearing a white blouse and blue pants; and one black male with the "super fly" look, i. e., hair combed down rather than in an afro. McVickers also described a white-over-maroon Cadillac.

Williams made no effort to determine the basis for the conclusion that the described persons had been stealing checks. McVickers said some tenants had called the office complaining about checks being stolen and providing the descriptions. Williams did not determine, from the tenants themselves or even from McVickers, whether any tenant had claimed to have seen the persons steal checks or engage in any other suspicious activity. For all that Williams ascertained, the tenant reports could have been based on a failure of government checks to arrive on the usual day, thus

arousing a groundless suspicion of theft, coupled with unfamiliarity with or dislike for the three described persons. In addition, Williams did not ascertain why anyone connected the Cadillac with the thefts.

After patrolling the area for a short period, Williams located a Cadillac fitting the description parked on a nearby street. Appellant Edwards, a black male with the superfly look, was sitting in the driver's seat. A black woman wearing a white blouse and orange pants was walking nearby. Williams approached Edwards and sent fellow officer S. M. Shaw to speak to the woman.

As Williams approached the Cadillac, he saw Edwards bend down as if to place something on the floor. Williams asked Edwards for identification, but Edwards denied having any. When asked specifically about a driver's license, Edwards said that he had none and that he was not driving. Rather, said Edwards, he was merely awaiting his brother.

Shaw returned and reported to Williams that speaking to the woman had "proved negative." The woman denied knowing Edwards. Edwards also denied knowing the woman.

Williams requested and received permission from Edwards to search the car. Edwards got out of the car while Williams leaned in the open door and looked around. Williams found nothing.

At that point Williams and Shaw left Edwards and separated from one another. Shaw removed his shirt in an effort to avoid attracting attention to its light color and used binoculars to monitor activities at the apartment complex. Shaw was unable to observe any thefts from mail boxes, and after ten minutes he and Williams rejoined one another. Shaw related to Williams that he had observed Edwards speaking to the woman whom he had earlier denied knowing, and that Edwards had been driv-

ing the Cadillac. Williams left to find Edwards while Shaw pursued the woman.

Williams located the Cadillac backing out of a nearby driveway. When the Cadillac began to go forward, Williams used his flashing lights to stop the car. Edwards was driving, and Williams arrested him for driving without a license.[1] Williams placed Edwards in the back seat of the patrol car. Shortly thereafter Shaw arrived with the woman in the back of his patrol car. Williams and Shaw searched the Cadillac exhaustively. They searched the trunk and the glove compartment. Beneath the overlapping carpet in the space between the driver's seat and the door, the officers found two checks that proved to be stolen from the mails.

The officers immediately telephoned United States postal inspectors, who came to the scene. One day later, on May 2, 1974, Edwards was transferred from state to federal custody. The federal complaint for knowingly possessing stolen mail matter was filed May 3, 1974. On that date the authorities took Edwards before a magistrate. Edwards appeared at a preliminary hearing on May 10, 1974.

▆ Thirteen months later, on June 3, 1975, a grand jury indicted Edwards. He appeared at an arraignment on July 17, 1975. Edwards moved for suppression of the checks as illegally seized and for dismissal of the charges for failure to afford him a speedy trial. A magistrate conducted a hearing on the motions on October 10, 1975. The magistrate rendered his report November 5, recommending that both motions be denied. The district court adopted the magistrate's report on November 12. Edwards went to trial January 19, 1976. A jury convicted him the next day, and the judge sentenced him to three years imprisonment. Edwards appeals, pressing the fourth amendment and speedy trial contentions. Finding the search unconstitutional,[2]

1. Shortly thereafter Williams noticed that the car's inspection sticker had expired. He added that basis for the arrest.

2. Although Edwards may not have owned the car, the indictment charged possession of the

seized material. He therefore has "automatic" standing to challenge the search. *See United States v. Holmes,* 521 F.2d 859, 868 (5th Cir.

we reverse the conviction without reaching the speedy trial issue.[3]

## II.

The government first attempts to support the search on the theory that there was probable cause coupled with exigent circumstances. Probable cause exists only when the facts and circumstances within the officers' personal knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). We find an absence of probable cause.

The key to the probable cause issue is the impact of the original report that the three described persons were involved in stealing checks. Had Williams presented an affidavit to a magistrate recounting only that his informant, Ms. McVickers, believed that the described persons had been stealing checks, it is inconceivable that the magistrate would have issued a warrant either to arrest the described persons or to search the Cadillac. The informant's bare conclusion that criminal activity was afoot fell far short of the probable cause threshold. Here, as in *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1967), "[t]he tip does not contain a sufficient statement of the underlying circumstances from which the informer con-

cluded that" the accused had committed the crime attributed to him. The inadequacy of the tip to support a warrant necessarily indicates that it will not support a warrantless search; some showing of "the underlying circumstances" is as crucial in the latter situation as in the former. *See United States v. Brennan,* 538 F.2d 711, 720 (5th Cir. 1976). Because Williams neither identified the persons who had allegedly made the reports nor determined the reasons why they suspected the described persons of stealing checks, we do not believe that Williams had reasonable grounds to conclude that the described persons had in fact been engaged in theft. Williams knew only that somebody, for some reason, thought that they may have committed a crime. Fourth amendment freedoms do not evanesce in the presence of such conclusory allegations. If there had indeed been sufficiently reliable information amounting to probable cause, Williams could easily have elicited it from the service officer or from the tenants themselves.[4]

Lacking probable cause on the basis of the service officer's report, Williams did not thereafter gather sufficient additional information to cross the probable cause threshold. When first approached by Williams, Edwards willingly allowed the officer to search his car as thoroughly as desired. Edwards's only suspicious activity thereafter was talking to a woman whom he had earlier denied knowing. Although this activity may not be without consequence, we cannot assign it controlling significance in light of the frequency with which unac-

---

1975), *adopted en banc,* 5 Cir., 537 F.2d 227 (1976). The en banc decision in *Holmes* focused primarily on other issues and came from an equally divided court. Eight judges adopted the panel's discussion of standing. 537 F.2d at 228 n.2. Seven judges indicated doubt concerning the automatic standing rule. 537 F.2d at 233 n.3 (Ainsworth, J., dissenting). One judge found it unnecessary to consider the issue. 537 F.2d at 237 (Clark, J., dissenting). Whatever the arithmetic, we are of course bound by the *Holmes* adoption of the panel's automatic standing discussion, at least until the en banc court decides otherwise. Edwards was also present in the car when Williams approached it to make the search.

3. The seized checks provided the crucial evidence without which Edwards could not have been convicted. There is no indication that the government will have any basis for re-trying him. We therefore deem it appropriate to avoid any discussion of the speedy trial issue.

4. There is no indication that any need for prompt action precluded further inquiry. Obtaining additional information from the service officer would have required little if any additional time. Speaking with the tenants may have required little time and may have been unnecessary.

quainted men and women speak to one another. The Atlanta springtime, after all, brings more than beautiful flowers and pleasant climate.[5]

■ The absence of probable cause is highlighted in one additional respect. The initial search to which Edwards consented failed to produce any evidence, despite the fact that Williams had just observed Edwards make a suspicious movement toward the floor. Although Williams did not look under the carpet flap where the checks were ultimately located, we can conclude only that Williams had no basis at all for believing that there were checks in that area; otherwise, he would certainly have searched that area at the initial encounter. During part of the brief interim between the initial search and the later search, however, Shaw watched Edwards with binoculars. Shaw did not see Edwards obtain any checks. Upon the second stop of Edwards there was no reason for Williams to believe that the car contained any evidence that it had not contained when stopped initially. If Williams had insufficient suspicion to warrant looking under the carpet when he had Edwards's consent, he certainly had insufficient evidence to warrant looking under the carpet at the later search conducted without consent and without a warrant. Having obtained Edwards's unhesitating consent to an initial search and having observed nothing in the interim to indicate that the car's concealed contents had expanded, the officers had an insufficient basis to undertake the second search. The potential for abuse that such successive searches pose is too great to permit them under the circumstances here.[6]

We should note, as well, that Williams himself did not believe that probable cause existed. In his testimony he made clear that he searched the car only as part of a routine inventory process, not on the basis of any conclusion that probable cause existed. Although officers are of course not lawyers trained in the nuances of probable cause analysis, it is not too much to ask that someone, somewhere make the determination that probable cause exists before conducting a search that is later sought to be justified on that basis. In this case not only

---

5. Another innocent explanation of Edwards's discussion with the woman is that he was curious about the police investigation that had touched them both. Williams stopped Edwards at about the same time that Shaw stopped the woman. From where he was sitting Edwards apparently could see Shaw speak to the woman. Edwards's decision to compare notes with the woman upon the policemen's departure would not be surprising. At any rate, it is clear that the police could not have concluded with complete confidence that Edwards had lied.

Nor could the police have concluded with assurance that Edwards had lied when he denied that he had been driving. Edwards drove after speaking to the officer, but the record contains no hint that he drove earlier. Edwards's story that he was awaiting his brother was not necessarily inconsistent with his early departure. The police did not ask Edwards to remain in the area, and after having been confronted by the police Edwards may have deemed it advisable to leave. An innocent person might well have chosen to incur his brother's wrath rather than risk an unjustified brush with the law.

We therefore reject the government's suggestion that the police knew Edwards had lied. They knew only that he may have lied. In any event, the lies bore only an attenuated relation to the alleged crime. Under these circumstances Edwards's statements do not provide probable cause.

6. The government also seeks to rely upon some identification cards found on the seat during the contested search. Those cards were not in Edwards's name. The government never introduced the cards, and the evidence about them was vague. The government argues that the cards buttress its probable cause showing. The search, of course, was already underway. The government contends that even if there was not probable cause when the search began, the preliminary stages of the search—those that produced the identification cards—can be justified on the inventory search rationale discussed *infra* in section IV. There we hold that the inventory rationale justified looking on the seats but not beneath the carpet. The government argues that the identification cards seized in the inventory search produced probable cause, justifying the officers' action in exceeding the permissible scope of an inventory search. We disagree. First, the inventory rationale did not justify reading the cards. *See* note 12 *infra*. Second, the record does not disclose whether the officers found and read the cards before or after they found the checks beneath the carpet. Third, in any event the cards, which were not in evidence and about which we have only vague information, do not establish probable cause.

was there no warrant issued by a neutral magistrate, but there was in addition no determination of probable cause even by the officer engaged in the often competitive process of ferreting out crime. Probable cause did not exist.

### III.

■ The government next contends that the search was incident to the valid arrest for driving without a license. We agree that Edwards's lawful custodial arrest entitled the officers to conduct an incident search.[7] We disagree, however, with the government's assertion that the search actually conducted fell within that category.

■ Searches incident to lawful custodial arrests comprise one of the narrow exceptions to the general principle that searches are unconstitutional unless authorized by a prior judicial warrant. The exception serves two purposes. First, it allows the arresting officer to disarm the suspect, thus protecting the officer's safety and foreclosing the possibility of escape. Second, the exception permits the officer to prevent the suspect from destroying evidence. These twin goals simultaneously provide the justification for an incident search and its permissible limits. A lawful incident search cannot extend beyond the perimeters established by these goals.

The Supreme Court reviewed the history of the incident search exception to the warrant requirement in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Court swept away the inconsistencies in its earlier decisions and announced the standards that must guide us in the instant case:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

395 U.S. at 762–63, 89 S.Ct. at 2040 (footnote omitted).[8]

The *Chimel* standard clearly mandates reversal here. At the time the officers searched the car, Edwards was securely locked in the rear of the patrol car. He was

---

**7.** *See Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1974) (officers may conduct a search incident to a non-pretextual custodial arrest for driving without a license).

**8.** Two later Supreme Court decisions make clear that officers may search an arrestee's *person* without regard to an overly technical analysis of whether the traditional goals of an incident search might be furthered. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). *Robinson* approved a search that disclosed heroin in a crumpled cigarette package in the pocket of a person who had been arrested for driving with a revoked permit, a crime of which there is no tangible evidence for which the officers could have been looking. The Court clearly distinguished searches of the person from searches of places, indicating that the *Chimel* limits governed the latter but that full searches of the person were always permissible pursuant to non-pretextual custodial arrests.

obviously incapable of retrieving weapons or evidence from anywhere in the searched vehicle, let alone from beneath the carpeting there. The officers could reasonably have feared neither that Edwards would procure a weapon nor that he would destroy any evidence. This search simply was not incident to the arrest. *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ("the reasons that have been thought sufficient to justify warrantless searches carried out in connection with an arrest no longer obtain when the accused is safely in custody at the station house"); *Dyke v. Taylor Implement Manufacturing Company,* 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968) (search of vehicle held not pursuant to arrest when vehicle was parked outside jail to which arrestee had been taken); *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) ("Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest"); *United States v. Adams,* 424 F.2d 175 (5th Cir. 1970) (disapproving search after car driven to station). See also *United States v. Marshall,* 499 F.2d 76 (5th Cir. 1974). *cert. denied,* 419 U.S. 1112, 95 S.Ct. 788, 42 L.Ed.2d 809 (1975) (approving search of car after arrestee had been temporarily removed when officers had reason to believe shotgun was hidden there and when as part of routine procedure arrestee would be returned to car and required to drive it to station).

#### IV.

▮ A similar fate befalls the Government's final theory. Inventory searches, like other exceptions to the warrant requirement, must extend no further than the exigency that fostered their creation. In this case the search exceeded those limits and was invalid.

In a 5–4 decision, the Supreme Court upheld the inventory search theory in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Court made clear that when officers lawfully impound a vehicle in the regular course of their duties, the Constitution allows them to search the vehicle if to do so accords with their routine procedures. In the case at bar Edwards does not contend that impounding his car was a pretext to support the search or that the officers departed their routine procedures.[9] The officers were entitled to conduct an inventory search.

▮ A constitutionally permissible inventory search, however, is not what the officers conducted. Inventory searches are valid only because they may attain three goals. They may protect the car owner's property while it remains in police custody, they may protect the police against disputes over lost or stolen property, and they may protect the police from danger. *South Dakota v. Opperman, supra,* 428 U.S. at 367, 96 S.Ct. at 3096, 49 L.Ed.2d at 1004; *id.,* 428 U.S. at 378, 96 S.Ct. at 3101, 49 L.Ed.2d at 1010 (Powell, J., concurring). To be constitutionally permissible, an inventory search must be no more intrusive than necessary to respond to these goals alone.[10]

The search of Edwards's vehicle fails in this regard. This was not an inventory; it was an exploratory search. The inventory

Far from questioning *Chimel, Robinson* relied upon it. *See* 414 U.S. at 226, 94 S.Ct. 467. *Chimel's* insistence that incident searches be narrowly confined to their twin rationales continues to govern searches of places rather than persons. We have continued to look to *Chimel* for the appropriate standards governing incident searches of automobiles. *See United States v. Butler,* 533 F.2d 221 (5th Cir. 1976) (alternative holding) (approving search of items within arrestee's reach in car, citing *Chimel*); *Fry v. Estelle,* 527 F.2d 420, 422 (5th Cir. 1976) (approving incident search of car that "did not

extend beyond the limits indicated in *Chimel* . . .").

**9.** Officer Shaw testified that he looked beneath the carpeting of every car he impounded. Officer Williams testified to the contrary. Whichever characterization of standard practice is accurate, such sweeping searches are unconstitutional, as our later discussion makes clear.

**10.** In prior decisions upholding inventory searches, we have emphasized that the searches responded to the legitimate goals of such procedures. *See, e. g., United States v.*

rationale simply does not permit a sweeping, unbounded search of a vehicle. The automobile may be the cosmos for an inventory search, but the fourth amendment gives no sanction to satellitic invasions. Justice Powell, whose fifth vote was crucial to the outcome of *Opperman*, emphasized the limitations on inventory searches in his concurrence. He noted,

> [T]he unrestrained search of an automobile and its contents would constitute a serious intrusion upon the privacy of the individual in many circumstances. But such a search is not at issue in this case. . . . Upholding searches of this type provides no general license for the police to examine all the contents of such automobiles.

428 U.S. at 379, 96 S.Ct. at 3101–02, 49 L.Ed.2d at 1011 (footnote omitted). The practice upheld in *Opperman* consisted of surveying the car's exterior for damage and its interior for valuables. The police there made a practice of searching the glove compartment (a frequent repository of valuables) but did not attempt to enter a locked trunk. *Id.*, 96 S.Ct. at 3102 n. 6. Thus the search responded to the approved goals of protecting valuables and protecting the police from false claims.

In contrast, the practice at issue in the case at bar is much broader. The police found no valuables in the cabin or glove compartment, but the absence of valuables in need of protection did not slow their momentum. They searched the trunk and painstakingly examined the vehicle's crevices, failing to remove the rear seats only because they were nonremovable. Finally, they looked beneath the vehicle's carpeting, hardly a likely place for valuables or instru-

ments posing a threat to the police during detention of the car. In sum, this search, especially the segment that yielded the checks beneath the carpeting, did not respond to the legitimate goals of a constitutionally valid inventory search. Even the right to inventory would not justify ripping an automobile apart.

The limitations that we place upon inventory searches are not trivial or merely technical.[11] Despite the wealth of language that privacy in automobiles is less important than in other areas, most members of our society must frequently use automobiles to convey undeniably private papers and effects. For example, the workload of this court often requires judges to take their work home. The automobile provides the usual mode for transporting drafts of opinions, notations indicating the probable outcome of submitted cases, and confidential messages from other judges. To say that there is no expectation of privacy in such papers, release of which would constitute a dereliction of duty, would be to ignore reality. And judges are of course not alone in this regard. Virtually everyone must sometimes use an automobile to carry private matters. It is an unfortunate fact that automobiles provide the primary means of transportation for most of us. When the police come into contact with those automobiles, as they frequently will, all expectations of privacy are not automatically forfeited. Rather, when routine practice calls for impounding a car, the police may make the limited intrusion necessary to secure valuables and to protect themselves. The fourth amendment forbids them to go further.[12] These principles invalidate the ex-

*Kelehar*, 470 F.2d 176 (5th Cir. 1972); *United States v. Ducker*, 491 F.2d 1190 (5th Cir. 1974). We did not mention protecting the police from danger, the third rationale listed in *Opperman*. To the extent of any inconsistencies, of course, *Opperman* now governs.

11. In *United States v. Grill*, 484 F.2d 990, 992 (5th Cir. 1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974), we emphasized the importance of limitations on the "temptingly simplistic" invocation of the term "inventory" search.

12. Perhaps the greatest intrusions upon protected privacy that would result from eliminating the limits on inventory searches involve the reading of papers carried in the car. Such prospects weighed heavily in Justice Powell's insistence that limits be imposed. *See South Dakota v. Opperman*, 428 U.S. 364, 380 n. 7, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (Powell, J., concurring). He noted that there the police found "'miscellaneous papers,' a checkbook, an installment loan book, and a social security status card," but he emphasized that there was no showing that the police examined the con-

tensive search here. This was no inventory search.

The mobility of an automobile may produce some restrictions on the exactions of the fourth amendment, but it most assuredly does not make every automobile a permissible target for a complete search by every policeman at every intersection. The automobile is the happy hunting ground of many a police safari, but even in this most troubled environment the endangered species of fourth amendment protection is not yet extinct. The fourth amendment is not crushed by the four wheels of an automobile; automobiles do not work a forfeiture of privacy. As mobile as our society is and as mobilized as we are to eliminate crime on the streets, we cannot subscribe to the thesis that the Constitution must be completely overrun whenever an automobile is the subject of a search.

The fourth amendment has enough vitality to sustain the claim that the search here was violative of its sacred precepts. The government having failed to bring the search within one of the narrowly limited exceptions to the warrant requirement, the conviction is REVERSED.

GEE, Circuit Judge, dissenting:

I respectfully dissent from Part IV of the court's opinion, that which discusses inventory searches, and from the result.

The standard attack on an inventory search is to contend it was a pretext. No such contention being made here,[1] to attain its result the court has been driven to write matter which must be taken as applying at large to such searches. In the process, I fear important legal principles have been disturbed.

The court obtains its result by declaring that such searches may not be "sweeping" or "unbounded," a declaration which it claims to found on Mr. Justice Powell's concurrence in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Next, without stating what the limits of such searches are to be, it holds that this search transgressed them. But the passage from the Justice's concurrence on which the court founds its opinion does not, when read as written, say what the court believes it says. Hence, the court's conclusions, being founded on a fallacy, are themselves inevitably fallacious.

I do not think this search was unreasonable, and this, as I shall later demonstrate, is the test of *Opperman*—not some mechanical notion that cursory inventory searches are tolerable while thorough ones are not. As the court notes, the police had seen Edwards make a suspicious move toward the floor of the car. Their attention attracted to that area, the police lifted a "carpet flap" and found the stolen checks. The opinion's characterization of this action as "ripping an automobile apart" seems to me to put the thing a little high; I must suppose the carpet was loose in the first place or Edwards would not have been able to put the checks under it, as the jury found he did. Nor can I follow the opinion's observation that the cache was "hardly a likely place for valuables," since valuables— the checks—were found there and since it is

tents of such items. The police merely removed them for storage. *Id.* Here, in contrast, the police read the seized checks and read the identification cards found on the front seat. The inventory rationale provides no warrant for doing so. Thus even if the inventory theory allowed looking beneath the carpeting—which it did not—the police would not have been entitled to read the checks absent probable cause and exigent circumstances. The police are of course free to recognize items that appear to be government checks. Finding items that even without being read could probably be identified as checks might well have given the police probable cause under the circumstances here. Finding cards on the front seat, however, would not have. The officers were not entitled to read the cards, and the contents of the cards

therefore cannot buttress the government's probable cause theory. *See* note 6 *supra.*

Our emphasis on the privacy expectations that inhere in papers should not be taken as an indication that inventory search limitations protect only papers. It is impossible to catalog in advance all the purveyors of intimate details about a person. The fourth amendment requires that inventory searches go no further than necessary to effectuate the limited goals that gave rise to this narrow exception to the warrant requirement.

1. Though I, for one, would have regarded the circumstances under which this search was conducted as dubious.

the common experience of mankind that people hide all manner of things, from car keys to floor sweepings, under carpet edges.

Nor is the teaching of *Opperman* what the majority declares: that inventory searches must be cursory and, insofar as they are thorough, just so far they are invalid. Instead, as the *Opperman* opinion repeatedly, but for today vainly, states, they are to be *reasonable under the circumstances.*[2] Indeed the Supreme Court has more than once done its best to indicate that some circumstances may justify very thorough searches indeed: only four years ago, for example, in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), matter was held properly admitted in evidence that was found in an automobile's locked trunk. Under *Dombrowski* and *Opperman,* then, the court's result in this particular case is wrong; and that is serious enough.

But what is vastly more serious, the court profoundly misreads the *Opperman* concurrence of Mr. Justice Powell. To begin with, even were the court correct in that reading, it is strange practice to seize upon passages from such a writing—a mere expression of additional views by one who begins by stating that he joins in the Court's opinion[3] —and found a decision upon them. But let this pass. The real vice in the majority opinion is that it first misunderstands and then misquotes even the small passage which it fixes upon. For the phrases quoted from Mr. Justice Powell's concurring opinion do not bear the sense which the majority seeks to place upon them—the sense of setting limits to the thoroughness of an inventory search. Except in one marginally material aspect, they do not even concern such matters.

Instead, as the passage quoted makes plain—when the majority's elisions are restored—the Justice writes to contrast "unrestrained" automobile searches in *general* circumstances with searches carried out in the *inventory* circumstance, and to indicate as well that the power to inventory does not extend to a general examination of the *contents* of letters, checkbooks, etc., which are found in its course.[4] But by telescoping the language in which these two notions are expressed, the court makes it appear to address the thoroughness of the search, a matter with which it is scarcely concerned at all. I give the passage in full, with the majority's quotes italicized and with explanatory footnote 7 appended:

> Although the expectation of privacy in an automobile is significantly less than the traditional expectation of privacy associated with the home, [citations omitted], *the unrestrained search of an automobile and its contents would constitute a serious intrusion upon the privacy of the individual in many circumstances. But such a search is not at issue in this case.* As the Court's opinion emphasizes, the search here was limited to an inventory of the unoccupied automobile and was conducted strictly in accord with the regulations of the Vermillion Police Department. *Upholding searches of this type provides no general license for the police to examine all the contents of such automobiles.*[7]
>
> [7] As part of their inventory search the police may discover materials such as letters or checkbooks that "touch upon intimate areas in an individual's personal affairs," and "reveal much about a person's activities, associations, and beliefs." *California Bankers. Assn. v. Shultz,* 416 U.S. 21, 78, 94 S.Ct. 1494, 1525, 39 L.Ed.2d 812 (1974) (Powell, J., concurring). See also *Fisher v. United States,* 425 U.S. 391, 401 n. 7, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976). In this case the police found, *inter alia,* "miscellaneous papers," a checkbook, an installment loan book, and a social security status card. App. 77. There is, however, no evidence in the record that in carrying out their established inventory duties the Vermillion police do other than search for and remove for storage such property without examining its contents.

428 U.S. at 379, 96 S.Ct. at 3101–02, 49 L.Ed.2d at 1011.

---

**2.** The point is made, remade, and buttressed by quotations from three different cases at 428 U.S. 371–373, 96 S.Ct. 3098–9, 49 L.Ed.2d 1006–1008.

**3.** 428 U.S., at 376, 96 S.Ct., at 3100, 49 L.Ed.2d, at 1009.

**4.** Even these, however, necessarily can be glanced at sufficiently to be *identified,* otherwise there is no inventory.

Since the majority's collage of Mr. Justice Powell's concurrence is the basis of its conclusion that this search was invalid, I can on no account concur in what the majority says or does here. Doubtless there are limits to the proper scope of inventory searches, limits to be developed when proper cases are presented. Had the Edwards car been "ripped apart," for example, in fact rather than in hyperbole, grave questions would have been presented. It was not; they are not; and the majority—in its zeal to perform what it seems to regard as emergency damage control on an opinion by a court superior to ours—has been driven to such innocent but most unfortunate expedients as its opinion evidences. Viewing this as no part of our office, I regretfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL and FAY, Circuit Judges.

BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this case reheard en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.