UNITED STATES of America, Plaintiff-Appellee,

v.

J. B. JORDAN, Defendant-Appellant.

No. 76–1360.

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1977.

Rehearing Denied Oct. 27, 1977.

Burke Mordy, Ardmore, Okl., for defendant-appellant.

number (5) to the end of the *West Peachtree* opinion. 437 F.2d 230–31.

Michael P. Carnes, U. S. Atty., Dallas, Tex., Reuben H. Wallace, Jr., Asst. U. S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

SIMPSON, Circuit Judge:

The critical question raised on this appeal is the constitutionality of a search of appellant's car by police patrolman Black of the city of Bowie, Texas. The trial court denied a Motion to Suppress the warrantless search and the evidence discovered while it was in progress, a sawed-off shotgun, the unlawful possession of which was the basis of the prosecution. Officer Black testified at the suppression hearing.

On January 30, 1975, at approximately 1:00 a. m., officer Black observed appellant J. B. Jordan drive away from a salvage and wrecking yard owned by appellant's father. Black knew that appellant's driver's license had been suspended. Black had also received information from an unnamed informant that Jordan on occasion carried a .410 gauge shotgun in his car. Black followed Jordan for a short distance and stopped him. Black asked appellant for a driver's license, which appellant admitted not having. The officer then told Jordan that he

had been informed that appellant carried a sawed-off shotgun. According to Black, Jordan told him that he owned such a gun but that it was at a girlfriend's house.[1] Black testified outside the jury's presence that appellant became extremely nervous at mention of the shotgun. Because of this reaction, Black told appellant that he was going to conduct a search of the car. Black testified that at that point appellant volunteered to get the gun himself, "let me get it for you". Jordan at trial denied having made such a statement. Black instructed appellant to remain where he was, while he, Black, searched the car. In his search, Black found a red cloth bag under the front seat which contained the sawed-off shotgun in question. Jordan was then placed under arrest for illegal possession of the shotgun. He was given a *Miranda* warning at that time.

Appellant was indicted and convicted for knowingly, willfully, and unlawfully possessing a firearm,[2] that is, a weapon made from a .410 gauge shotgun, having a barrel length of 7⅝ inches and an overall length of 15¹⁄₁₆ inches, which firearm was not registered to him, in violation of Title 26, U.S. Code, Section 5861(d),[3] and was sentenced to five years imprisonment pursuant to Title 26, U.S. Code, Section 5871.[4]

On appeal, Jordan argues that the search of his vehicle was unlawful and, as such, all evidence obtained as a result of that search, specifically the sawed-off .410 shotgun, should have been excluded.

1. Appellant testified at trial that he did not admit ownership of such a gun. R. 134.

2. Firearm is defined in Title 26, U.S. Code, Section 5848(1) as follows:
   (1) Firearm.—The term "firearm" means a shotgun having a barrel or barrels of less than 18 inches in length, or a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any

firearm whether or not such firearm is included within the foregoing definition.

3. Section 5861(d) provides:
   It shall be unlawful for any person—
   * * * * * *
   (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . .

4. Section 5871 provides:
   Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.

The government concedes (as it must) that the informant's tip, standing by itself, was not a sufficient basis for probable cause, as the record contains no factual basis for that information. See *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). It further concedes that this was not a search based on consent on the part of appellant, nor was it a search justified because appellant was violating state law by driving without a driver's license. Rather, the government argues that the combination of the above things with the appellant's nervous reaction to questioning about appellant's possession of a sawed-off shotgun, and appellant's further alleged volunteering to get the gun for the officer gave the officer probable cause to search the vehicle.

We agree that up to the time of the mention of the shotgun no probable cause was established. See *United States v. Edwards*, 554 F.2d 1331 (5th Cir. 1977) [decided June 27, 1977]. But we believe that when the police officer made the statement to appellant that he had received reliable information that appellant sometimes carried a sawed-off shotgun, then, from that moment, Jordan was being interrogated by the officer and it was the officer's obligation to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966).

> In *Miranda* the Supreme Court stated: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

This Court, in past cases, has never attempted to set forth definitively the distinctions between a custodial and a non-custodial interrogation. We have instead adopted a case-by-case approach. See *United States v. Akin*, 435 F.2d 1011 (5th Cir. 1970), cert. denied, 401 U.S. 1101, 91 S.Ct. 1263, 28 L.Ed.2d 548 (1971); *United States v. Montos*, 421 F.2d 215 (5th Cir. 1970), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532; *Agius v. United States*, 413 F.2d 915 (5th Cir. 1969). But we have identified significant factors to be considered in determining that a defendant is in custody, and thus required to be given *Miranda* warnings. These factors are (1) probable cause to arrest, (2) subjective intent of the police (whether or not the police believe the defendant free to leave the interrogation), (3) subjective intent of the defendant (whether or not defendant believes himself free to leave), and (4) whether the investigation has focused on the defendant. *Alberti v. Estelle*, 524 F.2d 1265, 1267 (5th Cir. 1975), cert. denied, 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976); *United States v. Carollo*, 507 F.2d 50, 52 (5th Cir. 1975), cert. denied, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105; *Brown v. Beto*, 468 F.2d 1284, 1286 (5th Cir. 1972); *United States v. Phelps*, 443 F.2d 246, 247 (5th Cir. 1971); *United States v. Montos, supra*. We have stated that "[n]o single criterion is necessarily decisive". *Montos, supra*, 421 F.2d at 223. Thus, this Court held in *Carollo* that "under the facts of this case, the focus-of-investigation factor alone was [not] enough to create a custody situation". *Carollo, supra*, 507 F.2d at 52. (Emphasis added). This may imply that there may be a case where a focus-of-investigation factor standing by itself would be sufficient. That is not our primary concern, however. Rather, our distillation from *Carollo* and the other cases cited is that in a case-by-case analysis we need not always find all factors present but must decide whether the factors present sufficiently call into play the *Miranda* requirements.

In the present case, the officer who stopped Jordan did so initially, he testified, because he knew that his driver's license had been suspended. After determining that appellant had no license, the officer next addressed himself to appellant's possession of a shotgun. From that point on, the officer had crossed the boundary with respect to a routine investigation of one who had no driver's license. The focus of the investigation was no longer concerned with a driver operating a vehicle without a license, but instead switched to whether

this driver was in possession of an illegal firearm.[5] The focus-of-investigation factor, then, was present. That the police officer addressed appellant in declaratory fashion ("I . . . informed him [appellant] that I had received some reliable information that he was sometimes carrying a .410 sawed-off shotgun . . . ") rather than with an interrogatory sentence we find to be of no significance. The statement had the force of an interrogation. It clearly intended to elicit an incriminating response.

In the recent case of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), without discussing the *Miranda* issue raised, as the bar expected, the Supreme Court addressed the sole issue of whether, under the facts present, respondent Williams had been deprived of his Sixth Amendment right to the assistance of counsel. In outline, the factual background was that Williams was convicted of the murder of a ten year old girl and his conviction was affirmed by the Iowa Supreme Court. A federal district court granted Williams *habeas* relief on the grounds that statements he made to police officers while being moved by automobile 160 miles were not voluntary. A divided Court of Appeals for the Eighth Circuit affirmed.

Before surrendering himself to the Davenport, Iowa, police, Williams had contacted his lawyer, Henry McKnight, in Des Moines, who advised Williams to surrender. McKnight then went to the Des Moines police station and told the Des Moines police that he had talked to Williams and instructed him to surrender to the Davenport police. When the Davenport police called the Des Moines police to tell them that Williams had surrendered, McKnight again conversed with his client:

"In the presence of the Des Moines Chief of Police and a Police Detective named Leaming, McKnight advised Williams that Des Moines police officers would be driving to Davenport to pick him up, that the officers would not interrogate him or mistreat him, and that Williams was not to talk to the officers about Pamela Powers [the murdered girl] until after consulting with McKnight upon his return to Des Moines. As a result of these conversations, it was agreed between McKnight and the Des Moines police officials that Detective

---

**5.** That this detention took place in a vehicle on the street rather than in a police station is of little import. As this Court has previously stated, "it is now certain that the mere fact that interrogation takes place in the familiar surroundings of the defendant's home or place of business rather than in the police station does not necessarily mean the defendant is not being subjected to custodial interrogation". *Phelps, supra*, 443 F.2d at 247. See *Orozco v. Texas*, 394 U.S. 324, 326–327, 89 S.Ct. 1095, 1096, 22 L.Ed.2d 311, 314–315 (1969).

In this respect see further our recent decision in *United States v. Warren*, 550 F.2d 219 (5th Cir. 1977). There we struck down as unconstitutional a search of a vessel on the high seas sought to be supported by statements made by a defendant in the absence of *Miranda* warnings in response to questioning by U. S. Coast Guard officers. We observed:

"The defendant asserts that any statements he made concerning the undeclared currency were obtained in violation of his Fifth and Sixth Amendment rights since at that time he had not been given his *Miranda* rights, and, therefore, these statements themselves were inadmissible, and they also could not be used to support the search of the Stormy Seas. We agree with both points. Focus for *Miran-*

*da* purposes occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of actions in any significant way. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). There is no question that all the defendants had been sufficiently deprived of their freedom such that *Miranda* warnings should have been given. The defendants had all been removed to the fantail of the ship, their guns, which were lawfully on board had been seized as soon as the Coast Guard boarded the ship, all officers who boarded the ship were armed, and the Steadfast was nearby with three machine guns on its deck to insure that the Stormy Seas did not depart unexpectedly. *Miranda* warnings are required when one is effectively deprived of freedom of movement in any significant way and this is especially true when the questioning is designed specifically to yield incriminating statements. There is no doubt, therefore, that these defendants had been denied their freedom of movement to the degree necessary to trigger the giving of *Miranda* warnings."

*Warren, supra*, 550 F.2d at 225–226.

Leaming and a fellow officer would drive to Davenport to pick up Williams, that they would bring him directly back to Des Moines, and that they would not question him during the trip."

*Id.* at 391, 97 S.Ct. at 1235, 51 L.Ed.2d at 431–432.

Before they left for Des Moines, Williams met with a Davenport attorney named Kelly who "reiterated to Detective Leaming that Williams was not to be questioned about the disappearance of Pamela Powers until after he had consulted with McKnight back in Des Moines". *Id.* at 391, 97 S.Ct. at 1236, 51 L.Ed.2d at 432.

However, during the trip to Des Moines, Detective Leaming gave what later became known as his "Christian burial speech", in which he spoke of the snowy weather conditions, the difficulty of finding the slain girl's body in such weather, the fact that the ten year old girl had been taken from her parents on Christmas Eve and that those parents were entitled to a Christian burial of their little girl. After this speech by Leaming, Williams revealed the location of the girl's body.

The Supreme Court had no problem in determining that Leaming's speech was a form of interrogation:

"There can be no [serious] doubt, . . . that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him. Detective Leaming was fully aware before departing for Des Moines that Williams was being represented in Davenport by Kelly and in Des Moines by McKnight. Yet he purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible."

*Id.* at 399, 97 S.Ct. at 1239–1240, 51 L.Ed.2d at 436–437. This we view as strongly supportive of the position we have taken here—that officer Black's statement to Jordan that he had information that he carried a sawed-off shotgun—was the equivalent of interrogation.

In *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), the Supreme Court stated: "Since under the procedures of Anglo-American criminal justice [defendants] cannot be constrained by legal process to give answers which incriminate them, the police have resorted to other means to unbend their reluctance, lest criminal investigation founder. Kindness, cajolery, entreaty, deception, persistent cross-questioning, even physical brutality have been used to this end. In the United States, 'interrogation' has become a police technique, and detention for purposes of interrogation a common, although generally unlawful, practice." *Id.* at 571–573, 81 S.Ct. at 1862, 6 L.Ed.2d at 1041–1042. Certainly the police may not circumvent a constitutional requirement by using the "technique" of posing a question in a declaratory fashion.[6]

As for the other factors determining that a custodial interrogation was taking place or that appellant was "deprived of his freedom in any significant way . . ." both subjective tests were met, that is, neither the officer nor the appellant believed that the appellant was free to leave. This the government conceded during oral argument.

We are unwilling to hold that *Miranda* warnings in this case were necessary only after the establishment of probable cause (that is, at that point in time—conceding *arguendo* that the government established probable cause—when appellant volunteered to get the shotgun from his car after being told that the officer was going to search the vehicle himself). To do so would allow the use of tactics which are inimical to our criminal justice system, *Culombe, supra,* and violative of the Fifth Amendment's privilege against self-incrimination. *Miranda, supra.*

Appellant was entitled to the protection provided by the *Miranda* warnings, and the

---

6. Cf. *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977) [decided July 20, 1977].

denial of that protection rendered his conviction constitutionally defective.

REVERSED.

GEE, Circuit Judge (dissenting):

I respectfully dissent.

Officer Black stated to Jordan that he understood Jordan carried a sawed-off shotgun. In response, Jordan stated that he did but had it elsewhere.[1] Officer Black threatened to search Jordan's car. Jordan then volunteered to get the gun.[2] Black, prudently enough, declined this offer and found it himself.[3]

It may be that Officer Black threatened both to interrogate and to search Jordan. But he did neither[4] since Jordan, as has been said elsewhere in another context, forestalled him by a timely compliance. For the reasons stated in the dissent to *United States v. McCain*, 556 F.2d at 256 (5th Cir. 1977), I would not hold that Jordan was interrogated nor extend the rationale of *Brewer v. Williams, supra*, a sixth amendment case, to this fifth amendment problem.

---

1. Since the judge who heard the witnesses refused to suppress the evidence and the jury found Jordan guilty, it seems clear that there have been implied findings of fact that Jordan made this admission and also volunteered to get the gun, though he denied both at trial.

2. *See* note 1 above.

3. It is worth noting, as the majority fails to make clear, that the supposed "custodial interrogation" took place while Officer Black was still sitting in his patrol car and Jordan was standing outside the window. Black left his patrol car only after Jordan volunteered to retrieve the shotgun.

4. Before Jordan made the statements in question.