UNITED STATES of America,
Plaintiff-Appellee,

v.

Oliver R. BENNETT,
Defendant-Appellant.

No. 80–7178

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit B

Oct. 2, 1980.

Ed Hine, Jr., Rome, Ga., for defendant-appellant.

Richard H. Dean, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL, FAY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Oliver R. Bennett appeals his conviction under 18 U.S.C. § 922(h), making it a felony for a felon to receive a firearm which has traveled in interstate commerce, and under 18 U.S.C. Appendix § 1202, making it a felony for a felon to possess a firearm which has traveled in interstate commerce. The only question raised by appellant is whether remarks made by a police officer constitute interrogation under the rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This question requires this circuit for the first time to apply the Supreme Court's recently declared definition of "interrogation" for *Miranda* purposes found in *Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We affirm.

## FACTS

On November 17, 1979, at approximately 4:00 p. m., Chief J. R. Buchanan of the Aragon Police Department monitored a radio call from the Polk County police dispatcher, notifying all patrol units of an incident at a tavern in which a man with a firearm had threatened another individual. The unidentified assailant had reportedly left the bar heading south on Georgia Highway 101 in a yellow automobile with Tennessee plates.

At approximately the same time, the Polk County Police received a complaint from Mrs. Sheila Parrish to the effect that appellant Bennett had come to her home with a rifle and, after an argument, had fired several shots at her house. Mrs. Parrish reported that Bennett had left her home in a yellow automobile. As a result of Mrs. Parrish's complaint, the Polk County police dispatcher made another call, also monitored by Buchanan, asking all patrol units to be on the lookout for Bennett who was traveling in a yellow automobile with Tennessee tags.

Within five minutes .after he had monitored this second call, Buchanan recognized Bennett traveling south on Georgia Highway 101 in the described automobile being driven by another individual. Buchanan notified the Polk County Police Department that he had located Bennett, and began to follow the automobile. Buchanan shortly observed Bennett and his companion turn into a parking lot of a superette. Buchanan did not follow the suspects into the parking lot, but continued his surveillance from a distance and radioed Bennett's position back to the Polk County Police.[1] The driver of the automobile went into the market while Bennett used a public phone located at the front of the store.

Two or three minutes after Bennett and his companion had turned into the superette, Polk County police officers Everett Willis and Ralph Thomason arrived at the scene. The officers walked over to Bennett, who was still on the phone, and told him they wanted to speak to him about the complaint they had received from Mrs. Parrish. The officers admitted that they planned to question Bennett and that they intended to arrest Bennett on a charge of public drunkenness, because of his inebriated state. Neither officer, however, began to interrogate or converse with Bennett as he had not completed his call. While Officers Willis and Thomason were with Bennett at the phone, Buchanan joined them. None of these officers read to Bennett his *Miranda* rights.

Approximately a minute or two minutes after Officers Willis and Thomason had approached Bennett, Chief Robert Sparks of the Polk County Police, who had monitored all the calls, pulled into the parking lot.[2] Bennett and the officers were still at the front of the store, approximately six to ten feet from the front of the yellow automobile. As Chief Sparks walked toward the group at the front of the store, he walked past the yellow automobile and peered into its open window.[3] Chief Sparks, observing a rifle inside the car similar to the rifle described by Mrs. Parrish, said: "There is a gun in the car."[4] Chief Sparks reached

---

1. Buchanan apparently did not attempt to arrest Bennett since these incidents occurred outside of Buchanan's department's jurisdiction.

2. The record is not clear as to whether Bennett had finished his call at this time.

3. There is a difference in the briefs, unresolved by the record, as to whether Chief Sparks took the most direct route to the group at the front of the store or whether he took a circuitous route, presumably with the intent to search the automobile. Chief Sparks admits that one reason, among others, why he went by the car was to glance in because, given the nature of the two calls, he was concerned about the safety of the officers. We believe whether Chief Sparks intended to search the car or not is irrelevant to the question presented on this appeal since whether there was an interrogation depends on whether the officers should have expected a response to their remarks or actions. See *infra*, at pp. 1311–1312. Chief Sparks' intention in walking past the automobile is irrelevant to this determination.

4. The record is silent and the trial court made no findings as to whether this statement was directed to Bennett, to the other officers, or to no one in particular.

through the open window and pulled the gun from the car. As he did so, Bennett stated, according to Chief Sparks, "Yes, he had a damn gun and he was going deer hunting with it and there wasn't no law against him having a gun to go deer hunting . . . ." As Chief Sparks got the gun out, he pulled the action back to see if it was loaded, whereupon Bennett told him to be careful as the gun had a hair trigger.[5] Bennett at this time was placed under arrest for public drunkenness.

The trial court refused to suppress Bennett's statements made in response to Chief Sparks' words and actions. It found that when Officers Willis and Thomason told Bennett they needed to talk with him concerning Mrs. Parrish's complaint, Bennett was effectively in custody and entitled to have his *Miranda* warnings read to him before any questioning. The trial court further found that Bennett's statements were the result of Chief Sparks' remark, but that they were voluntarily given and were not the result of any interrogation. We agree that there was no interrogation.

**5.** Bennett does not contest the seizure of the rifle.

**6.** Before *Innis*, this court had on at least two occasions found a statement by a police officer to constitute interrogation for the purposes of *Miranda* even though the remarks were not framed as questions. *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977) (statement to suspected drug courier that some couriers had suffered serious injury or death when package of drugs concealed in body cavity ruptured constituted interrogation); *United States v. Jordan*, 557 F.2d 1081 (5th Cir. 1977) (statement by officer directly to individual stopped for license check that officer had information the individual had a shot gun in his car was interrogation); *cf. United States v. Carpenter*, 611 F 2d 113 (5th Cir. 1980), *cert. denied*, — U.S. —, 100 S.Ct. 3013, 65 L.Ed.2d — (1980) (discussion by officers in automobile about "every day" matters not interrogation). These cases were based on the rationale of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), which dealt with a defendant's Sixth Amendment right to counsel. Because the Supreme Court stated in *Innis* the definition of "interrogation" as used in the Fifth and Sixth Amendment contexts is not "necessarily interchangeable" because of differing policies underlying the two constitutional provisions, — U.S. at —, 100 S.Ct. at

## LAW

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established that the prosecution may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. at 444, 86 S.Ct. at 1612. Included among those procedural safeguards are the now famous *Miranda* rights. By "custodial interrogation" the Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Ibid.*

In *Rhode Island v. Innis*, — U.S. —, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court has recently refined its holding in *Miranda* by giving a definition of "interrogation" as it is used in the context of Fifth Amendment rights.[6] There the Supreme Court stated:

We conclude that the *Miranda* safeguards come into play whenever a person in cus-

1689, n. 4, we focus primarily on the holding of *Innis* in deciding the case before us, instead of the discussion of interrogation in *Brewer* and the holdings of its progeny. Comparison, though, should be made to Mr. Justice Blackmun's observation in *United States v. Henry*, — U.S. —, —, 100 S.Ct. 2183, 2196, 65 L.Ed.2d — (1980) (dissenting opinion) that he has difficulty in identifying the material difference which *Innis* asserts between the formulations of the rules of *Miranda*, concerning Fifth Amendment rights, and those of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), concerning Sixth Amendment rights.

See also *Harryman v. Estelle*, 616 F.2d 870 (5th Cir. 1980), also decided before *Innis*. There this court, sitting en banc, found a *Miranda* violation when an officer, during a routine pat-down body search and before giving the *Miranda* warnings, asked, "What is this?" upon discovering a condom containing a white powered substance tucked under defendant's waistband. In answer to the state's argument that the officer's question was not really a question, this court said "It is enough to decide that what the officer said could reasonably have had the force of a question on the accused." 616 F.2d at 874.

tody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. —— U.S. at ——, 100 S.Ct. at 1689–90 (emphasis in original).

In *Innis*, a murder and robbery suspect had been arrested and informed several times of his *Miranda* rights. The defendant had requested an attorney before being placed in a police car with three officers for the trip to the station house. At the time of the arrest, the police were searching for the suspected murder weapon, a shotgun. While in the car, the officers initiated a conversation among themselves in which they voiced their fears of the consequences should children from a nearby school for handicapped children find a loaded weapon. The defendant interrupted this conversation, telling the officers he would lead them to the gun, which he did. The Supreme Court held the defendant's remarks and the shotgun admissible on grounds that the conversation among the police officers was not interrogation.

Applying the test of *Innis*, we note that Chief Sparks' words and actions were not an express question. His words were either an exclamation or declaratory sentence. Both words and actions were the natural reactions of one finding a rifle in the automobile of an individual suspected of causing disruption with a gun and in no way took the form of interrogation.

Since there was no express questioning, *Innis* requires us to determine whether the words and actions of Chief Sparks were "functionally equivalent" to questioning, which in turn was defined as those words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect," other than those words or actions "normally attendant to arrest and custody."

Addressing first the "normally attendant to arrest and custody" prong of the test, we find that what Chief Sparks said and did was normally attendant to the arrest of Bennett. Chief Sparks knew that the suspect had been accused of firing shots into a home and causing disruption at a bar with a rifle. He would have been derelict in his duty had he not warned his fellow officers of a weapon near the suspect. Whether or not Bennett at the time was restrained, the rifle presented a real threat to the safety of others, as even restrained suspects have been known to escape.[7] To expect Chief Sparks to ascertain first whether Bennett's *Miranda* warnings had been given before stating there was a rifle in the automobile, or to require him to take special efforts to assure the suspect he was not asking a question, would put absurd restrictions on the police during an arrest. Although the Supreme Court gives us no guidelines as to

7. Whether or not Chief Sparks' search of the car was a valid search incident to an arrest, it remained imperative for him to inform his officers of a possible threat to their safety. The record does not indicate whether any of the officers other than Buchanan knew that Bennett had a companion in the store. If Chief Sparks knew this, this would be an additional reason for his statements.

what is normally attendant to arrest and custody, we believe it clear that those words and actions, which are necessary or appropriate to inform fellow officers of a potential threat to their own safety and that of others during the course of an arrest or custody, are "normally attendant."[8]

With respect to the other prong of the "functional equivalent" test, we think the facts indicate that Chief Sparks could not have reasonably anticipated that his remarks would elicit an incriminating response from Bennett. In so concluding, we focus not on Chief Sparks' intent but on what response he reasonably should have expected.[9] Here, Chief Sparks arrived only moments after Bennett had been accosted by police officers. There is no evidence that he would have any reason to suspect that Bennett was in such a state of mind that he was unusually disoriented or upset at the time of his arrest. *Cf.* 100 S.Ct. at 1690. His remark was a natural exclamation in response to what he saw with no

emotive undertones which could be expected to elicit a response. There is no indication Chief Sparks wanted, demanded or expected a response from Bennett. As such, Chief Sparks could not have reasonably anticipated Bennett's response.

Turning from the bare test of *Innis* to its facts, we conclude the facts of this case are stronger for the government than those in *Innis*.[10] While it is true that the suspect in *Innis* had been given his *Miranda* warnings and Bennett had not, this difference alone does not make *Innis* a more compelling case. The circumstances in which Bennett found himself when Chief Sparks spoke were not as coercive as in *Innis* since Bennett was still in public, at the front of a store, and not handcuffed within the confines of a patrol cruiser. The remark by Chief Sparks certainly was not as emotively charged as the conversation in *Innis* concerning the threat to handicapped children.[11]

**8.** Comparison should be made to *United States v. Castellana*, 500 F.2d 325, (5th Cir. 1974) (en banc) where this court held that a question to a suspect within custody as to whether there were any weapons within his reach was not interrogation under *Miranda* since the question was not an attempt to elicit evidence of a crime. The rationale of that decision was that the question asked was a bona fide and minimally offensive security measure. 500 F.2d at 326. Here, while the rifle was apparently not within reach, the security measure taken by Chief Sparks was even less offensive than that in *Castellana*.

**9.** A question we do not resolve is the precise effect the presence or absence of *Miranda* warnings will have on what the police should reasonably anticipate from their remarks. Whether the police know *Miranda* warnings to have been given or not is relevant to what responses they should expect since a detainee to whom the warnings have been given can be expected to be more reticent in the face of police remarks. Because the record is unclear here as to what Chief Sparks knew when he arrived, we reach our decision assuming that he believed no *Miranda* warnings to have been given.

**10.** Two dissenters in *Innis* agreed with the test formulated but thought it was inappropriately applied to the facts of that case. J. Marshall and J. Brennan dissenting, —— U.S. at ——, 100 S.Ct. at 1692. A third dissenter disagreed with the majority's test, and thought it was inappropriately applied as well. J. Stevens, dissenting, —— U.S. ——, 100 S.Ct. at 1696–7.

**11.** Although we have pointed out that the Supreme Court in *Innis* stated that interrogation in the Fifth and Sixth Amendment contexts is not "necessarily interchangeable," —— U.S. at ——, 100 S.Ct. at 1689, n. 4, the Court did not foreclose completely that in looking at this problem, decisions in one context might not inform decisions in the other context. We leave for a later date what distinctions and similarities might exist between interrogations in the context of these two constitutional provisions. We only note that here the remark by Chief Sparks was in no way comparable to the "Christian burial" speech of *Brewer v. Williams, supra*, a Sixth Amendment case.

We also can distinguish those Fifth Circuit cases in the Fifth Amendment context prior to *Innis* and determined on the basis of *Brewer*, which held remarks by police to constitute interrogation. Chief Sparks' comment did not have the frightening implications of the police statements in *United States v. McCain, supra*, concerning possible injury or death from rupture of drug packages hidden in body cavities. His exclamation did not have the undertones demanding a response as did the policeman's remark in *United States v. Jordan, supra*, that he [the policeman] had been informed the suspect had a gun in his car. This remark was made while the policeman was alone with the suspect, was directed to the suspect, and carried implications that the suspect had something to hide.

We believe the instant case is controlled by *Innis,* and accordingly the trial court's decision is

AFFIRMED.