**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John L. WARREN, Jr., David DeFina, Des E. Shick and Thomas A. Warren, Defendants-Appellants.**

**No. 75–4368.**

United States Court of Appeals, Fifth Circuit.

April 7, 1977.

Daniel S. Pearson (Court-Appointed), Miami, Fla., for J. Warren.

Sky E. Smith (Court-Appointed), Miami, Fla., for DeFina.

Alan M. Medof (Court-Appointed), Miami Fla., for Shick.

Stewart E. Parsons, Tallahassee, Fla. (Court-Appointed), for T. Warren.

Robert W. Rust, U. S. Atty., James L. Whitten, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

FAY, Circuit Judge:

The defendants-appellants, John Warren, Thomas Warren, David DeFina and Des E. Shick were convicted in a joint trial by jury of conspiring to import marijuana into the United States (in violation of 21 U.S.C. § 963 (1970), and transporting from the United States money in excess of $5000.00 without filing a report (in violation of 31 U.S.C. § 1058, 1101 (1970)). The appellants assert multiple errors on appeal. Finding merit in some of the assignments of error asserted by defendants Thomas Warren, John Warren and David DeFina, we reverse as to these defendants and remand for further proceedings consistent with this opinion. As to defendant Des E. Shick, we affirm.

### FACTS

The facts, considered in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), indicate that in the summer of 1974 the defendant Shick approached John Cruse (an unindicted co-conspirator) and requested Cruse to captain the shrimp vessel Stormy Seas from Appalachacola, Florida to Santa Marta, Colombia, in order to bring back approximately ten tons of marijuana. Thereafter, Cruse met on at least two occasions with defendant Thomas Warren (an attorney) to discuss the details of the mission. The defendant Shick was also in attendance.

Prior to departing for Colombia in the Stormy Seas, Cruse and Shick went to the Tallahassee, Florida apartment of defendants DeFina and Thomas Warren. DeFina turned over to them a trash compactor to be placed on board the Stormy Seas.

Defendants Shick and John Warren then drove to the home of John Warren in South Miami, Florida and picked up a smaller boat to be used in the off-loading of the marijuana when it was returned from Colombia. An additional small boat was borrowed by defendant DeFina from his brother-in-law and placed on board the Stormy Seas. In order to gain permission to use this small boat, defendant DeFina contrived a story to the effect that he needed to use the boat because he was going on a lobster diving trip in Key West, Florida.

The Stormy Seas departed Appalachacola on August 15, 1974 with defendant Thomas

Warren and Cruse aboard. After a stop in Key West to pick up defendant John Warren, the vessel proceeded toward Colombia. Defendants Shick and DeFina were not on board the vessel.

In the early evening of August 19, 1974, the Stormy Seas was sighted by the United States Coast Guard Cutter Steadfast in the windward passage between Haiti and Cuba, some 700 miles from the United States. Aboard the Steadfast, in addition to Coast Guard personnel, were Special Agent Thomas Battell of the Drug Enforcement Administration and Customs Patrol Officer William Wallace. Battell had been assigned to the Steadfast to aid in the enforcement of the Federal narcotics laws. Wallace was assigned to look for any violations that Customs would handle.

A decision to board the Stormy Seas was made on board the Steadfast. The leader of the boarding party was informed that the purpose of the boarding was to be a "Coast Guard safety inspection." The boarding party consisted of three Coast Guardsmen and Battell and Wallace. All five men were armed with .45 caliber weapons.

Upon boarding the Stormy Seas, the three Coast Guardsmen asked for and received all weapons on board the ship, and then proceeded with their safety inspection. Battell and Wallace made their own search of the ship. The safety inspection of the ship revealed nothing of significance other than a very small amount of marijuana in the nightstand of Captain Cruse. The inspection by Wallace and Battell uncovered no contraband. The Warrens and Cruse were then removed to the fantail of the ship. Agent Wallace then began questioning the defendants. Wallace's reason for this interrogation was that he had gotten conflicting stories from the occupants of the Stormy Seas about the purpose of the trip, and he suspected its purpose was really to bring back narcotics and that money might be aboard. Wallace then questioned each defendant about how much money he had on board. Defendant Thomas Warren admitted, after several questions, to have

$7,000.00. He also admitted, in response to a question, that he had not filled out the proper forms for taking the money out of the country. Agent Wallace then asked the defendant Thomas Warren if he could see the money. The defendant then led Wallace, Battell and a Coast Guardsman back to the crew's quarters. In the crew's quarters, the defendant lifted up a corner of a mattress and pulled out two or three envelopes and handed them to Wallace. Wallace examined them and saw that there was considerably more than $7,000.00 in these envelopes. At this point, Agent Battell read Thomas Warren his rights. Agent Wallace then asked if there was any more money. Defendant Thomas Warren denied having any more. Agents Wallace and Battell then asked Thomas Warren to remove the remaining envelopes from beneath the mattress and he did so. Agent Wallace again asked if this was all the money and the defendant Thomas Warren stated that it was. At that time Agent Battell lifted up the head of the mattress revealing still more envelopes. A total of $41,500 in United States currency and 46,800 Colombian pesos were revealed.

Thereafter, Cruse admitted to Agent Wallace that he and the two Warrens were going to Colombia to pick up marijuana. Cruse and the Warrens were then arrested. The vessel was seized and a custody party placed on board. No further search revealed any contraband, but a number of documents and tangible items supportive of the conspiracy charge were uncovered. Among these documents was a letter written on the stationery of the Colombian consul and addressed to "Tommy" describing pre-arrangements for entering Colombian waters; a yellow legal pad belonging to Thomas Warren containing a detailed check list of local and Colombian contacts and equipment to be used in picking up and packaging the marijuana; and Thomas Warren's passport showing a one-week visit to Colombia only two weeks prior to departing in the Stormy Seas.

Due to the number of defendants and the varied assignments of error which are

raised, it is necessary to discuss the merits of each defendant's appeal separately.

## THOMAS WARREN

 The first error raised by Thomas Warren is that the warrantless search of the vessel Stormy Seas was conducted in violation of the Fourth Amendment and thus the trial court erred in denying his motion to suppress all evidence that was a product of that search. The government argues that the Coast Guard has statutory authority to stop an American registered vessel on the high seas for a safety and documentary inspection. 14 U.S.C. § 89(a).[1] This statute, and the validity of searches made pursuant to it, has been the subject of extended litigation over the past several years. See e. g., *United States v. Hillstrom,* 533 F.2d 209 (5th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Odom,* 526 F.2d 339 (5th Cir. 1976); *United States v. One 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir. 1976); and *United States v. Winter,* 509 F.2d 975 (5th Cir. 1975).[2] The statute as applied to safety inspections *conducted by the Coast Guard* has been held constitutional by this court. *United States v. One 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir. 1976). Since the initial intrusion by the Coast Guard in the case *sub judice* was made under the guise of a safety inspection, it is not necessary now to determine wheth-er a search by the Coast Guard for other reasons would be constitutional. This Court needs only warn that no Act of Congress can authorize a violation of the Constitution. *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). An American vessel, by venturing on the high seas, does not lose the protection of the Constitution from intrusions by its own government. Consequently, § 89(a), with its broad granting of power, is subject to serious constitutional attack if implemented without caution and restraint. This is not to say, however, that the Coast Guard must refrain from stopping an American vessel on the high seas when it has probable cause to believe a crime has been or is being committed. Prior cases have indicated that such actions are constitutionally permitted. See e. g., *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Maul v. United States,* 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927).[3] Nor is this to say that if the Coast Guard, while in the process of conducting a valid safety inspection, discovers evidence providing probable cause to believe a crime has been or is being committed, that it cannot extend the search into areas not normally covered by a safety check. See *United States v. Hillstrom,* 533 F.2d 209 (5th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 734, 50 L.Ed.2d 749 1977; *United States v. Odom,* 526 F.2d 339

1. The text of § 89(a) reads:
 "The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if

 it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

2. For an excellent article tracing the history of this statute and the Fourth Amendment problems inherent with it, see Comment, *At Sea With the Fourth Amendment,* 32 *U. Miami L.Rev.*—(Fall, 1977)

3. In *Lee,* the boarding and searching of an American vessel on the high seas by the Coast Guard was upheld since the Coast Guard had probable cause to believe the vessel was subject to seizure for violation of revenue laws.

(5th Cir. 1976); *United States v. One 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir. 1976). What is proscribed, however, is extending for no reason a search for safety purposes beyond that which is reasonably needed to determine if the safety and documentary regulations have been followed. This Court is also casting doubt on the authority of the Coast Guard under this statute to stop a vessel for any reason other than safety or documentary purposes absent a showing of probable cause that a crime has been or is being committed.

 Here, we are presented with a situation where the Coast Guard validly intercepted the vessel Stormy Seas, boarded the vessel, and proceeded with a permissible safety inspection of the vessel. No error would have been committed if this constituted the whole factual setting (and, of course, no evidence of criminal wrongdoing would have been discovered). Error was committed, however, by the fact that the Coast Guard boarding party consisted not solely of three Coast Guardsmen, but also of agents from the Drug Enforcement Agency and Customs. All evidence derived from the search of the Stormy Seas was a product of the efforts of these two agents. This evidence was unconstitutionally obtained for two reasons. First, nowhere in 14 U.S.C. § 89(a) is the Coast Guard authorized to delegate its authority to stop and search a vessel to members of other branches of the Federal Government.[4] Therefore, any evidence derived from the efforts of these two agents was unconstitutionally obtained. The two agents had absolutely no authority to board the Stormy Seas. They also had no authority to direct any questions to people on board the Stormy Seas, and they certainly had no authority to follow up the answers to these questions with a search of part of the vessel. The second reason the search was invalid is because it went be-

yond the scope of a safety inspection.[5] The search was impermissible even if it had been conducted by members of the Coast Guard. Once on board a stopped vessel, the Coast Guard has no authority to interrogate or question the crew on any subject unrelated to the purpose of the stopping. In the present case, once the safety inspection was completed and no violations were discovered the Coast Guard would have no authority to direct questions at the vessel's crew to determine how much money they had on board. Such questioning is clearly outside the purpose for which the initial stopping was made. The questioning in this case is also the grounds for another of Thomas Warren's assignments of error.

 The defendant asserts that any statements he made concerning the undeclared currency were obtained in violation of his Fifth and Sixth Amendment rights since at that time he had not been given his *Miranda* rights, and, therefore, these statements themselves were inadmissable, and they also could not be used to support the search of the Stormy Seas. We agree with both points. Focus for *Miranda* purposes occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or *otherwise deprived of his freedom of actions in any significant way. Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). There is no question that all the defendants had been sufficiently deprived of their freedom such that *Miranda* warnings should have been given. The defendants had all been removed to the fantail of the ship, their guns, which were lawfully on board, had been seized as soon as the Coast Guard boarded the ship, all officers who boarded the ship were armed, and the Steadfast was nearby with three machine guns on its deck to insure that the

---

4. Note also that no independent authority could be found authorizing agents of the Drug Enforcement Agency or Customs to make warrantless searches and seizures on the high seas.

5. The government is alleging on appeal that the Coast Guard had probable cause to stop and search the vessel for criminal violations. They

base the probable cause on the fact that the shrimp boat was in an area in which no shrimping was done, and also on the fact that the boat did not have its shrimping nets out ready to use. We find this argument totally without merit.

Stormy Seas did not depart unexpectedly. *Miranda* warnings are required when one is effectively deprived of freedom of movement in any significant way and this is especially true when the questioning is designed specifically to yield incriminating statements. There is no doubt, therefore, that these defendants had been denied their freedom of movement to the degree necessary to trigger the giving of *Miranda* warnings.

■ The defendant alleges several other errors on appeal. He claims that the trial court erred in admitting testimony as to the meaning of the word "shirts" appearing in a letter found among his possessions on the Stormy Seas. The agent of the Drug Enforcement Agency testified as an expert that this word meant cocaine. The word was written in a letter signed by a person named "Freddy" and it was written on the stationery of the Colombian Consul. The context in which the word was used was ". . . don't forget to pick up my shirts from Ozzie." The defendant argues that since he was not charged with any substantive or conspiracy offense involving cocaine, receipt of this evidence was error. The trial judge ruled that since the letter was already in evidence this testimony was admissable to explain the letter, and to show the state of mind, intent, and motive of the defendants. In any further proceedings in which the explanation of this letter is offered into evidence,[6] we feel that the trial judge should give serious consideration as to whether or not this testimony should be received. We hold now only that receipt of this testimony was harmless in light of the weight of the other evidence.

Thomas Warren's last assignment of error[7] alleges that the court erred in admitting a statement he made at the time of arrest advising the other people on board to remain silent. He charges that this testimony was an impermissible comment on his, and defendant John Warren's, Fifth Amendment right to remain silent. We need not decide this issue since the statement was a product of the illegal search, and, therefore, would be inadmissable in any further proceedings involving this defendant.

## JOHN WARREN

Many of the errors assigned by John Warren are the same as those assigned by the other defendants. The defendant, who was on board the Stormy Seas at the time of the illegal search, alleges that the trial court erred in not suppressing all fruits of that search. For reasons stated *supra,* we agree. The defendant also alleges that the trial court erred in admitting testimony explaining the word "shirts", and in permitting the introduction of testimony referring to Thomas Warren's comment that everyone remain silent. We have also previously disposed of these claimed errors.[8]

■ The defendant does raise two issues previously undiscussed. The defendant contends that the trial court erred in denying his in-trial motion for a severance after the government elicited from a witness the statement of Thomas Warren that "We are all in this together." (T 214). The prosecution had previously agreed not to admit any statements or admissions of co-defendants inculpating the defendant. Because of this agreement, John Warren did not file a motion for a separate trial. Since the co-defendant Thomas Warren did not testify, John Warren was never afforded the opportunity to effectively confront Thomas Warren as to the statement attributed to him.

---

**6.** As against defendants John and Thomas Warren this problem will not reoccur since the letter would be considered a fruit of the illegal search and thus inadmissible.

**7.** The defendant had one other assignment of error. The defendant charges that the trial judge had made some impermissible comments during voir dire. We find this assignment wholly without merit.

**8.** The defendant also charges that the trial court erred in denying his motion for a mistrial after statements by the government during closing argument allegedly referred to his failure to testify. As explained *infra* in the discussion of defendant Des E. Shick, we hold that this was not a comment on the failure to testify.

The statement should not have been admitted and is violative of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

█ The defendant's last assignment of error refers to the trial court's refusal to grant defendant's request that potential government witnesses be excluded from a suppression hearing. Rule 615, Federal Rules of Evidence, provides that at the request of a party "the court *shall* order witnesses excluded . . . ." This rule is mandatory in nature, and the trial judge erred in denying the defendant's request to exclude.

## DES E. SHICK

█ Defendant Des E. Shick's principal argument on appeal refers to a statement by the government during its closing argument allegedly referring to Shick's (and the other defendant's) failure to testify. The sequence of events leading to the challenged statement, and the content of the statement itself, leads to the conclusion that no harmful error was committed.

At the conclusion of the government's final argument, counsel for the defendants made their argument. Counsel for the defendant John Warren argued to the jury that John Warren was only on board the Stormy Seas to go fishing. Specifically, defense counsel argued:

What in the world is he doing there unless it was for an absolutely innocent purpose. There is no sense at all in John Warren being on board the vessel, none whatsoever, unless John Warren is such a masochist that he wants everyone to catch him and to totally destroy his life.

The only sense it makes is if John Warren is on board the vessel for exactly the purpose he has in mind, which is to be on board to go fishing, to do whatever he is going to do, to take that time and to fly back from Bogota. (T 504).

This argument was made despite the fact that no evidence was presented by the defense as to what John Warren was doing on board the Stormy Seas. The objected-to comment of the Government came in rebuttal argument. The Government's reply was:

I submit that no one has given you any reasonable explanation of why John Warren and Tommy Warren were on a shrimp boat 700 miles from the United States, carrying that trash compactor and those 300 bags, $41,500 of United States currency, 46,800 Colombian pesos; a boat that was rented at $450 a day for the rental period of twenty-two days, and it works out to $9,000 or $10,000.

Mr. Pearson has told you about the fact that John Warren had an airline ticket. They ask you to believe that Mr. John Warren would be on this shrimp boat, renting at $450 for twenty-two days—after fourteen days it was $500 a day—that he would have $10,000 in cash and he was just going on a pleasure trip. (T 524, 525)

It is the feeling of this Court that the objected-to response of the government was simply an answer to the question posed by defense counsel—what was John Warren doing on board the ship—and a comment on the reasonableness of counsel's explanation—that he was there to go fishing. As a result, no reversible error has occurred.

█ The Fifth Amendment forbids either comment by the prosecution on a defendant's silence, or instructions by the court that such silence is evidence of guilt. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, *rehearing denied,* 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965). However, the threshold question to be answered is whether the challenged remark refers to the defendant's failure to testify. The guideline used in answering this inquiry is:

. . . whether the remark was manifestly intended or was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. White,* 444 F.2d 1274, 1278 (5th Cir. 1971), *cert. denied,* 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971)

The challenged remarks of the prosecution do not meet this test. At most they go to the failure of the defense attorneys (as opposed to the defendants) to adequately explain or counter the testimony of the unindicted co-conspirator, the various government officials, and the prosecution's other witnesses and exhibits. *U. S. v. Hill,* 508 F.2d 345 (5th Cir. 1975). The remark did not specifically point to any or all of the defendants as not having testified, and in light of the weight of the evidence and the fact that the trial judge gave a positive instruction to the jury that nothing was to be presumed from the failure of the defendants to testify, any impropriety in the remark and the way it was made must be held to be harmless beyond any reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Shick also alleges that the trial court committed reversible error in denying his motion to suppress all items of evidence seized during the search of the Stormy Seas. While the search of the Stormy Seas was unlawful, Shick has no standing to object. Shick, in an attempt to get standing, alleges that he has a proprietary interest in the Stormy Seas. He bases this interest on the fact that he aided the government's chief witness, John Cruse, in leasing the vessel from Cruse's parents. Shick cites *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), as support. We hold simply that *Jones* was never intended to extend to this type of situation, and the mere giving of aid to someone to obtain a leasehold interest does not create the necessary proprietary interest to obtain standing.

Finally, Shick alleges several other errors on appeal. He challenges the denial of his motion to sever his case from the other defendants, that the evidence was insufficient to support the verdict against him on either count, and that the court erred in admitting testimony as to the meaning of the word "shirts". With reference to the first two of these assignments of error, we feel that they are totally without merit. As to the testimony explaining the word "shirts", we hold that, if error, it is at most harmless in light of the total weight of the other testimony.

## DAVID DEFINA

■ Defendant David DeFina raises two assignments of error on appeal. First, the defendant alleges that the evidence was insufficient to support the verdict against him. The defendant also challenges remarks made by the prosecution during closing arguments which referred to facts outside the record. This Court holds that in light of the paucity of evidence against this defendant, and the serious impropriety of the statement made during closing argument, these two factors taken together require that the judgments against the defendant be reversed.

The defendant DeFina was Thomas Warren's roommate. The evidence linking him to the conspiracy consisted of the facts that he was in his apartment when defendant Shick and Cruse came by to pick up a trash compactor for the Stormy Seas; that he relayed an instruction at this time to Shick and Cruse that Thomas Warren said "not to forget the adaptor" (T 273, 274); and that he later told a lie to his brother-in-law in order to borrow a boat to be placed on board the Stormy Seas.[9]

Whether or not this evidence alone is sufficient to link the defendant to the conspiracy is a question this Court need not decide at this time. There is, however, no question that this evidence is not weighty enough to overcome the prejudice done to the defendant by the government's statements in its closing argument. During the

---

**9.** There was also some very tenuous evidence linking DeFina to the conspiracy in the Government's Exhibit # 7 which was a yellow pad with the writing of Thomas Warren on it. One item on the pad referred to the fact that Thomas Warren was supposed to get some plastic bags from "Daffin." The government attempted to prove that "Daffin" really meant "DeFina" even though "Daffins" is a department store, formerly in Tallahassee, and presently in Marianna, Florida. It is hard to conceive that Thomas Warren could have made such a gross misspelling of his roommate's name.

government's closing argument the prosecutor stated:

> You will recall the further testimony of John Cruse was that it [the marijuana] was going to be offloaded in a small boat; that it was going to be driven in a truck by David DeFina to a house selected by Tommy Warren in Tallahassee, Florida. (T 452, 453)

The prosecutor later repeated this assertion when he stated:

> You will remember that John Cruse— that according to Johnny Cruse, according to Dino Shick, David DeFina was to drive a truck to take the stuff to Tallahassee. (T 469).

Then, after the defense counsel had attempted to counter these remarks in his closing argument, the prosecutor in his rebuttal placed further emphasis on these facts.

> Obviously, Mr. Smith and I, one of us is having a memory lapse. I recall that John Cruse stated that David DeFina was to drive the truck with the marijuana to the house in Tallahassee. (T 523)

A search of the trial record reveals the complete absence of any testimony that DeFina was to drive the marijuana to Tallahassee. Such testimony was not elicited from any witness during trial, nor can it be easily inferred from any physical evidence presented. It is a settled principle of law that the jury's consideration in a case should be limited to those matters brought out in evidence, and that summation should not be used to put before the jury facts not actually presented in evidence. *United States v. Spangelet,* 258 F.2d 338 (2nd Cir. 1958); *United States v. Martinez,* 466 F.2d 679 (5th Cir. 1972).

The content of the government's closing argument provided facts from which the jury could easily infer the defendant's knowledge of the conspiracy, and the intention of the defendant to join in the conspiracy and further its objectives. Even the

government in its brief to this court admits that the statement was dehors the record.

A review of the record discloses that the government failed to elicit from John Cruse's testimony the statement that David DeFina was supposed to drive the marijuana from the boat landing to a house in Tallahassee. Brief of Appellee at 29.

Since there is so little other evidence to support the two charges against the defendant, and since it is hard to imagine these statements having anything but a substantial effect in the minds of the jurors, it is impossible to hold this error harmless. Consequently, we reverse and remand for further proceedings consistent with this opinion.[10]

### CONCLUSION

The judgments against defendants John Warren, Thomas Warren and David DeFina are reversed and remanded for further proceedings consistent with this opinion. The judgment against Des E. Shick is affirmed.

---

10. The defendant also challenges the government's comment on closing argument allegedly referring to the defendant's failure to testify, and the introduction of testimony as to the meaning of the word "shirts". The court disposes of these assignments of errors in the same manner as they were disposed of when raised by the other defendants.