### THE FLORIDA BAR RE: THOMAS A. WARREN
Case No. 61,174
Supreme Court of Florida
November 5, 1981

Howell L. Ferguson for petitioner, Thomas A. Warren.

Dale Krout for the Florida Bar.

J. LEWIS HALL, JR., Referee and Circuit Judge.

---

## I. STATE OF THE PROCEEDINGS.

The petition of Thomas A. Warren seeking reinstatement as a member in good standing in the Florida Bar was filed in the Supreme Court of Florida on September 14, 1981, pursuant to Article XI, Rule 11.11, Integration Rule of the Florida Bar.

Following due notice, the final hearing was held on October 21, 1981 and was concluded on October 23, 1981. Both parties have been afforded a full and adequate opportunity to present testimony and evidence. This evidence has been completed and fully considered by the undersigned.

## II. PETITIONER'S PERSONAL AND PROFESSIONAL HISTORY

Thomas A. Warren is a resident of Tallahassee, Florida. He is 33 years of age, is married, and his wife is an attorney for the Public Service Commission of the State of Florida. Mr. Warren obtained his law degree from the Florida State University School of Law in December, 1973, graduating with honors. In 1970 Mr. Warren obtained a B.S. degree in business from the Florida State University, where he also participated in intercollegiate athletics.

Petitioner was admitted to the Florida Bar in May, 1974. He was engaged in the private practice of law in Tallahassee as a general practitioner with the law firm of Parsons and Warren until his suspension in May of 1976.[1] Since June of 1976 Mr. Warren has been and currently is employed as a law clerk in the law offices of Spriggs & Henderson, P.A., Tallahassee, Florida.

## III. THE HISTORY OF PETITIONER'S CRIMINAL PROCEEDINGS.

Petitioner was arrested on August 19, 1974 and charged with conspiracy to import marijuana, a felony under the laws of the United States, and transportation of monetary instruments without filing the requisite report, a misdemeanor. Approximately one year elapsed before a formal indictment was issued relating to these charges. Trial was held in the United States District Court for the Southern District of Florida in November, 1975, and Petitioner was convicted on both counts. The late Honorable William O. Mehrtens, District Judge for the Southern District of Florida, sentenced Petitioner to 18 months for the felony and a concurrent sentence of 6 months for the misdemeanor. Extremely unusual and extensive appellate proceedings followed. In light of the unusual nature of these proceedings, the undersigned deems it relevant and material to briefly describe them.

Nearly a year and one-half elapsed after Petitioner appealed his conviction before the United States Court of Appeals for the Fifth Circuit issued an opinion on April 7, 1977. In an unanimous decision, the three judge panel reversed Petitioner's conviction.[2] Four months later, after the Government petitioned for rehearing, the Fifth .Circuit Court of Appeals ordered that the case be reheard by the court sitting *en banc.* Argument was heard on the *en banc* reconsideration in September

---

[1]This suspension was automatic pursuant to Rule 11.07(3).

[2]*U.S. v. Warren,* 550 F.2d 219 (5th Cir. 1977). ("Warren I").

of 1977 and, nearly one year later, in August of 1978, the *en banc* court reversed the panel decision and reinstated Petitioner's conviction in an 8-6 decision.[3] In that opinion, the *en banc* court pretermitted review of the concurrent misdemeanor conviction. However, in an apparently unprecedented action, several months later the Fifth Circuit granted a second *en banc* rehearing to consider that issue. After yet another year passed, a unanimous decision of the *en banc* court finally issued in February of 1980, reversed the misdemeanor conviction, and ordered that a judgment of acquittal be entered on that count.[4] With this decision, Petitioner's appellate proceedings in the Fifth Circuit finally came to an end, having been in that Court for well over four years. A Petition for Certiorari to the United States Supreme Court was denied on May 19, 1980 and on August 19, 1980, exactly six years to the day after his arrest, Petitioner began his sentence.

A motion to reduce sentence was filed on Petitioner's behalf in the United States District Court for the Southern District of Florida in early fall, 1980. On November 4, 1980, the Honorable Sidney Aronovitz, United States District Judge for the Southern District of Florida, mitigated Petitioner's sentence, reducing it to one year and one day. In his order,[5] Judge Aronovitz found that:

> During the six years from initial arrest until the date of voluntary surrender to commence service of sentence, August, 1980, during which trial and various appeals were pending, "[Petitioner] ha[s] proved [himself] to be a contributing member of the community."

> Seldom, if ever, does the United States District Court have an opportunity, such as is presented here, in which it can ascertain the adjustment, rehabilitation and lifestyles of defendants post-sentence. This circumstance is indeed unique here, and affords the court an opportunity, which a judge is not usually permitted, in which he can evaluate the lifestyles, community contributions, remorse, admissions of guilt, adjustments, and the like.

*Id.,* at p. 1.

---

[3]*U.S. v. Warren,* 578 F.2d 1058 (5th Cir. 1978) (*en banc*) (8-6) ("Warren II").

[4]*U.S. v. Warren,* 612 F.2d 887 (5th Cir. 1980) (*en banc*) (13-0) ("Warren III").

[5]A true copy of Judge Aronovitz' Order was introduced at Petitioner's hearing as Petitioner's Composite Exhibit A-25.

On December 5, 1980, the United States Parole Commission agreed that mitigating circumstances existed, followed Judge Aronovitz' rationale, and granted Petitioner early parole. On January 5, 1981, Petitioner was paroled. Petitioner successfully completed his parole term, and his civil rights have been restored by the Governor of the State of Florida and members of the Cabinet.[6]

## IV.   SUMMARY OF THE TESTIMONY AND EVIDENCE.

### A.   FOR THE BAR—

The Bar presented no evidence, either testimonial or otherwise, at the final hearing.

### B.   FOR PETITIONER—

In addition to Mr. Warren, six witnesses testified on his behalf: four actively practicing attorneys (including Mr. Warren's employer of the past five and one-half years), an administrator of a major state hospital, and the director of a local community organization.

### 1.   Kent Spriggs.

Mr. Spriggs, of Spriggs & Henderson, P.A., Tallahassee, Florida, was admitted to the Bar in 1967 and has practiced law in Tallahassee for over ten years, specializing in complex Federal litigation, primarily employment discrimination law. Mr. Spriggs is also a Tallahassee City Commissioner. He has been Mr. Warren's employer since June of 1976. As his employer, Mr. Spriggs has had daily contact with and supervision of Mr. Warren during the more than five years that Mr. Warren has worked as a law clerk at Spriggs & Henderson. Mr. Spriggs testified in specific detail about the care that he and Mr. Warren have taken in assuring that the terms of Mr. Warren's suspension have been met.[7] Mr. Spriggs referred to specific communications which had occurred between him and the Florida Bar requesting guidance on the appropriate parameters of Mr. Warren's employment.[8] An informal opinion requested by Mr. Spriggs and issued by the Florida Bar stated that Mr. Warren ". . . may

---

[6]The record also reflects that since his suspension, the Petitioner has had no other arrests and has not been a defendant in any civil action.

[7]All quarterly reports required to be filed with the Florida Bar concerning Mr. Warren's employment status with Spriggs & Henderson, P.A. were filed. Petitioner's Composite Exhibits A-2-19 and 31. See Integration Rule 11.10(8)(b).

[8]Petitioner's Composite Exhibits A-20 through A-24.

ethically interview non-party class members for the purpose of preparing case documents in order to assist the attorney . . ." (Petitioner's Composite Exhibit A-21).

Mr. Spriggs made clear that the judge or special master in each case on which Mr. Warren worked was made aware of Mr. Warren's status as a suspended attorney working as a law clerk on the case. These judges and special masters included former Chief Judge Winston Arnow, United States District Court for the Northern District of Florida; Chief Judge William Stafford, United States District Court for the Northern District of Florida; Robert Crongeyer, United States Magistrate for the Northern District of Florida; Richard Lott, Esquire, Special Master, and Dr. Harold B. Crosby, Esquire, Special Master. None of these judges or special masters ever questioned the propriety of Mr. Warren's actions on any of the cases in which he worked.

Mr. Spriggs described in detail the duties and responsibilities of Mr. Warren as law clerk in Mr. Spriggs' law firm. As law clerk, Mr. Warren was involved almost daily in the drafting of supervised workproduct for Mr. Spriggs. These assignments included the drafting of various memoranda of law, complaints, motions, discovery requests, responsive pleadings and appellate briefs.

One case on which Mr. Warren was primarily involved was an extremely large class action in the Northern District of Florida styled *Stallworth v. Monsanto,* PCA 73-45. This case involved more than 700 class members. Mr. Warren was primarily responsible for the case management, including compiling interrogatory answers, interviewing non-party, non-client class members for the purposes of preparing case documents for Mr. Spriggs in presenting their claims at trial, analyzing data and documents, compiling exhibits for trial and drafting findings of fact and conclusions of law. Mr. Warren's time summaries in the *Monsanto* suit were introduced as part of Petitioner's Composite Exhibit A-29A. A review of these time summaries presents a clear picture of the extensive, and in depth work which Mr. Warren performed on the case. He expended more than 5,600 hours over 5 years on the case. This work involved a great variety of issues in this complex litigation.

Other documents included in Petitioner's Composite Exhibit A-29A included briefs, motions, and memoranda of law which Mr. Spriggs had selected from the case file. These documents had been drafted by Mr. Warren and reviewed and approved, sometimes with modifications, by Mr. Spriggs. In essence, as Mr. Spriggs testified, Mr. Warren had researched and authored the major portion of each of these documents.

Furthermore, these documents were merely a representative sample of the documents drafted by Mr. Warren under Mr. Spriggs' overall supervision.

The quality of work on these as on all legal issues worked on by Mr. Warren was always of the very highest quality. A review of the representative samples in Petitioner's Composite Exhibit A-29A shows the complex and intricate legal issues which have been presented and addressed in a scholarly and efficient manner.

Further representative samples of supervised work-product produced in large part by Mr. Warren were discussed by Mr. Spriggs. These documents and the cases from which they were extracted are found in Petitioner's Composite Exhibit A-29B through A-29H. These excerpts demonstrate the various kinds of cases on which Mr. Warren has worked, as well as the variety of legal issues which were created because of this diversity.

Mr. Spriggs also described the various publications which he and associates of his law firm, and Mr. Warren read in order to maintain the necessary competency level and current awareness of developments in the law. These publications included the Florida Bar News, The American Bar Association Journal, the advance sheets of Commerce Clearinghouse and Bureau of National Affairs relating to employment practice decisions and fair employment practices, advance sheets of the Lawyers' Edition 2d, the Florida Case Summary, the Florida Statutes and Florida Statutes Annotated, and the National Law Journal, a weekly legal publication. In addition to this extensive list of legal publications which Mr. Warren read, Mr. Spriggs further described the continuation of Mr. Warren's legal education, demonstrated through his enrollment in a graduate level statistics course in econometrics[9] at the Florida State University.

In addition, Mr. Warren has primary responsibility for maintaining a very specific and detailed current awareness of some of the more intricate and complex issues relating to the federal litigation that Mr. Spriggs' firm is involved in.

In summary, Mr. Spriggs feels his initial confidence in Mr. Warren's ability has been continually reaffirmed by Mr. Warren's workproduct and that Mr. Warren's legal ability is of the highest order.

---

[9]Econometrics and statistical analysis are becoming of crucial importance in employment discrimination cases, the specialty area of Mr. Spriggs' practice. For instance, Mr. Warren's professor at FSU is a national consultant who appears regularly as an expert witness in employment discrimination cases.

Mr. Spriggs indicated that he is aware of Mr. Warren's reputation with respect to his character and moral standing in the "community". Mr. Spriggs testified that within the Tallahassee legal community (including also non-Tallahassee attorneys who have had contact with Mr. Warren) and the community of their mutual social friends, Mr. Warren has a reputation for truthfulness, honesty, and high moral standing.

Mr. Spriggs' personal opinion was the same, and he placed utmost trust and confidence in Mr. Warren. In supporting this opinion he pointed to Mr. Warren's proven honesty in personal and professional relationships and the fact that Mr. Warren has always been mindful of his suspended status and ethical obligations of the Bar and to the Bar. He further explained that Mr. Warren's "task orientation" towards all forms of work demonstrated an extremely strong commitment and desire to remain in the legal profession. He further stated that Mr. Warren's marriage and purchase of a home in Tallahassee further demonstrated his character and moral standing.

Mr. Spriggs has never detected any feelings of malice displayed by Mr. Warren towards either law enforcement, the judiciary, or the Florida Bar, with respect to his conviction and suspension. In fact, Mr. Warren has displayed to Mr. Spriggs a sense that he was treated fairly by all.

Mr. Spriggs believed himself to be in the best position of anyone to comment upon Mr. Warren's sense of repentance or contrition, including his desire to conduct himself in an exemplary fashion in the future. While admitting that he did not understand the motivation behind the acts causing the initial discipline, Mr. Spriggs felt that this behavior was aberrational in nature and that he was absolutely confident that it would never be repeated. He further explained that the entire experience since Mr. Warren's arrest had had a definite maturing effect on Mr. Warren and that this again provided more evidence that there would never be any recurrence of the past aberrational acts. Mr. Spriggs displayed the highest level of trust in Mr. Warren and explained that he would have absolutely no qualms whatsoever about his being responsible for trust account funds were he to be reinstated.

### 2.   William Francis.

Mr. Francis is the general director of the Tallahassee YMCA and has held that position since March of 1972. He has known Mr. Warren as a YMCA member and a friend for some five or six years. He has seen Mr. Warren three or four times a week through Mr. Warren's participation

in the YMCA. Mr. Warren's reputation has always been good and he is well liked by all. Mr. Francis' own high opinion of Mr. Warren was demonstrated by his appointing Mr. Warren to the YMCA committee responsible for establishing rules for use of the handball/racquetball courts at the YMCA. Mr. Warren has been an active member on this committee, making several constructive and useful suggestions for improvement. Further participation in "Y" activities were demonstrated by Mr. Warren's suggestion that CPR courses be continued at the "Y", as well as assisting in the running of various handball tournaments held at the "Y". All of the events described by Mr. Francis occurred after Mr. Warren's conviction. Mr. Warren has demonstrated a sincere sense of repentance through various conversations and letters received by Mr. Francis while Mr. Warren was incarcerated. Mr. Francis feels that the events of the past are now firmly behind Mr. Warren and he is committed to "getting on with life".

Mr. Francis recommended Mr. Warren's reinstatement at this time without reservation.

3.   James H. Coil.

Mr. Coil is a partner in the Atlanta law firm of Kilpatrick-Cody and has been a member of that firm since 1970. He specializes in complex federal litigation, particularly in the area of employment discrimination law. Mr. Coil resides in Atlanta but has been co-counsel in the lawsuit of *Stallworth v. Monsanto* in the Northern District of Florida. As co-counsel in that lawsuit he first met Mr. Warren in June of 1976. Mr. Coil's duties in this lawsuit included the extensive case management relating to the class aspects of it. Because of Mr. Warren's similar duties, Mr. Coil had continuous contact with Mr. Warren from June 1976 through the settlement of the lawsuit in August 1980. Mr. Coil was made aware of Mr. Warren's suspended status and disability at his initial meeting and all attorneys involved in the case as well as the court were at all times apprised of said status.

Mr. Coil, who is obviously an intelligent and well-qualified attorney, described in some detail the nature of the *Monsanto* case. Mr. Coil was of the opinion that this lawsuit was one of the most intricate and complex employment discrimination cases. One of the major and novel questions presented by the case was how to adjudicate the individual claims of over 700 class members.

Mr. Coil explained that although employment discrimination was an area of legal specialization it was not a narrow specialty. To the contrary, one involved in this area was required to have an extensive

knowledge of the law of contracts, torts, damages, remedies, statutory construction, administrative law and agency. Necessarily, any person involved in this specialized field must remain current in these more general areas and as a matter of fact, many of the general areas of law referred to by Mr. Coil had in fact been extensively briefed in various legal submissions in the *Monsanto* lawsuit. He further explained that not only is the knowledge of law necessary but also an extensive and working understanding of the nature of business operations is likewise crucial.

Mr. Coil testified that Mr. Warren's reputation among the attorneys at Kilpatrick-Cody who worked on this case, of which there were many, as well as the Special Master who presided over the litigation, was of the highest level of professional ability. Mr. Coil reviewed Petitioner's Composite Exhibit A-29A, which included representative samples of supervised workproduct of Mr. Warren in the *Monsanto* case. Mr. Coil was intimately involved with these various documents and stated that they represented a very, very good quality of work. These excerpts were only an extremely small portion of the hundreds of briefs, memoranda of law and other legal documents which were filed in that case. Mr. Coil stated that the memoranda which Mr. Warren was involved in drafting displayed a uniformly high level of competence. Because of the extremely novel nature of this litigation, many first impression issues were raised. Notwithstanding this, again the legal briefs were always of the highest quality. Because of the novel nature of these issues, they required more scholarship than most issues would normally require.

His personal opinion of Mr. Warren's professional ability was that he is extremely capable in every aspect, having demonstrated this through the compilation and management of extremely complex data, through numerous occasions where complex facts and law had to be analyzed at a high level of competence and through the drafting of very high quality briefs. Mr. Coil had paid the highest respect to Mr. Warren's ability by stating that he would have been proud to have had him as co-counsel on any case with him.

Mr. Coil's testimony regarding Mr. Warren's reputation and moral standing in the community was also of the highest order. This community included the large number of persons in the class in the lawsuit as well as the group of lawyers and Special Master who sat on the lawsuit. His personal opinion of Mr. Warren's high quality of character and honesty was displayed by his feelings that he would never have had any question about dealing with Mr. Warren on only a "hand-shake basis", that is,

he would never feel compelled to reduce any agreement to writing once Mr. Warren's word was given.

Mr. Coil confirmed Mr. Warren's absence of malice towards those responsible for his disciplinary status. Mr. Warren had admitted the error of his past to Mr. Coil and Mr. Coil's own personal involvement with Mr. Warren, including visiting him during his confinement, indicated that he was looking forward to getting on with life and putting the past behind him.

His final recommendation was enthusiastically given for immediate reinstatement and his concluding remarks included that he hoped all attorneys had the moral standards that Mr. Warren presently holds.

4.  Stewart Parsons.

Stewart Parsons was admitted to the Florida Bar in 1967, had an extensive general practice in Tallahassee through 1976, and is presently the Director of the Forensic Unit at Florida State Hospital in Chattahoochee, Florida. Mr. Parsons has known Mr. Warren socially since 1969 and first knew him professionally through a clerkship that Mr. Warren had with Mr. Parsons' law firm in 1972 and 1973. In 1974, Mr. Parsons and Mr. Warren formed a law firm in which they practiced for approximately two years until Mr. Warren's suspension.

Mr. Parsons testified about Mr. Warren's reputation for character in the community, which included a large number of mutual friends as well as lawyers and business people in Tallahassee. Without question this reputation for character and honesty was exceptional and Mr. Warren was highly regarded in all of these quarters. On a personal level, Mr. Parsons felt Mr. Warren's character was impeccable, that he possessed a deep sense of ethics and loyalty.

Concerning Mr. Warren's professional ability, Mr. Parsons stated that Mr. Warren was bright, well-trained in the law, and always produced a high quality of work. He specifically commented upon Mr. Warren's research skills, that he has continued to maintain a current awareness of developments in the law through various readings and through his work and that his reputation for professional ability in the legal community is high. From his own personal conversations relating to various legal issues, Mr. Parsons knew that Mr. Warren has continued to maintain his current awareness of the developments in the law.

Mr. Parsons was in the unique position to comment upon Mr. Warren's lack of malice since he had represented Mr. Warren at the trial and on appeal. Mr. Warren had always shown no malice, had

admitted that he was wrong, and had shown no animosity or hostility towards any persons responsible for bringing about his discipline.

Mr. Parsons further expressed that Mr. Warren had always displayed a sense of repentance, that he knew he had agonized long and hard over the events that had brought about his discipline, that he had always displayed remorse for the pain and suffering he had caused his family and close friends. The personal price paid by Mr. Warren over the past seven years had been high, yet Mr. Warren had made the best of the situation, and had committed himself to rectifying the errors of the past. He recommended full and immediate reinstatement to the Bar without hesitation.

5. Philip Parsons.

Mr. Parsons was admitted to the Florida Bar in 1969, and presently practices with the law firm of Ausley, McMullen, McGehee, Carothers and Proctor, specializing in administrative law. Mr. Parsons has known Mr. Warren since 1972.

Mr. Parsons is currently a neighbor of Mr. Warren's and gave testimony on Mr. Warren's reputation for character in the legal community of Tallahassee, the social community of their mutual friends as well as the community of their neighborhood. This reputation was for unimpeachable character and moral standing. Mr. Parsons' own personal opinion was that he had no reservation concerning Mr. Warren's character.

Mr. Parsons has had professional contact with Mr. Warren since 1972-73 when Mr. Warren clerked for him. His work was always of the highest quality. Currently, and over the past several years, Mr. Parsons has had regular contact with Mr. Warren relating to various legal issues. Included among these is the fact that Mr. Parsons has executed affidavits for submission to the United States District Court for the Northern District of Florida concerning what is an appropriate rate of compensation for Mr. Warren's law clerk services. Necessarily he has reviewed Mr. Warren's work in order to base such opinion. This opinion has always been of the highest order and Mr. Warren's work has always demonstrated a complete and current awareness of the law. Mr. Parsons' opinion of Mr. Warren's present professional ability is that it is of an excellent nature and that this reputation is also held by other attorneys who have had contact with Mr. Warren.

Mr. Parsons has never seen any malice displayed by Mr. Warren toward law enforcement officials or the Bar and has seen a sincere sense of repentance.

Mr. Parsons wholeheartedly recommended full and immediate reinstatement for Mr. Warren. An extremely high compliment was paid by Mr. Parsons to Mr. Warren when he stated that he would feel no hestitation in entering into any fiduciary relationship, attorney-client relationship, or other relationship of trust with Mr. Warren.

6.   Kenneth Hart.

Mr. Hart was admitted to the Florida Bar in 1975 and presently practices with the law firm of Ausley, McMullen, McGehee, Carothers and Proctor, specializing in commercial litigation and administrative law. He has known Mr. Warren personally since 1966 when they first met through their mutual membership on the Florida State University football team.

Mr. Hart stated that Mr. Warren's reputation of unimpeachable character and moral standing in the community was very high and that there were no reservations about it both in their mutual friends as well as in the legal community of Tallahassee. This same opinion was held by other members of his present law firm including Graham Carothers, who had had significant contact with Mr. Warren in a large class action case involving the Gadsden County School Board. Mr. Hart, a member of the Board of Directors of the Florida Flambeau newspaper, also testified concerning the reputation of Mr. Warren among members of that body, which oversaw the hiring of Mr. Warren as sports editor of this newspaper in 1978.[10] No reservations were displayed by the board.

Mr. Hart had several experiences upon which to base his opinion of Mr. Warren's current professional ability. Personal contact with Mr. Warren in a case where Mr. Hart had represented a defendant involved a number of complicated legal issues. Mr. Warren always displayed a high degree of understanding of the issues. On other instances, Mr. Hart had discussed with Mr. Warren issues involved in cases in which Spriggs & Henderson, P.A. had requested the Ausley firm to associate in. These cases included medical malpractice, personal injury, and the Fair Labor Standards Act. At all times Mr. Warren displayed a high quality of understanding of the current developments in these areas of the law.

Mr. Warren had never displayed any malice towards anyone responsible for his discipline, and, in fact, had told Mr. Hart that he had been

---

[10]This job as sports editor of the Flambeau was held by Mr. Warren while he was still a full-time law clerk at Spriggs & Henderson, P.A. See letter of Editor David Bedingfield attesting to the extremely competent and committed work performed by Mr. Warren in his role as sports editor, Petitioner's Composite Exhibit B-3.

treated fairly. Mr. Hart had sensed a deep repentance on the part of Mr. Warren and has discussed these issues with him, finding that Mr. Warren regrets what he did greatly. Mr. Hart had no reservation about a positive prediction for future conduct, basing this opinion on the fact that he has gotten married, purchased a house, worked hard in every aspect of his life and remained diligent in his professional aspirations towards reinstatement as a lawyer. All of this demonstrated to Mr. Hart that Mr. Warren wishes to be a productive member of society and that he would not repeat the past mistake.

In conclusion, Mr. Hart stated that he was extremely confident in Mr. Warren and would entrust him with his own legal affairs were Mr. Warren reinstated. He recommended unqualified reinstatement.

## C. Testimony of Petitioner

Mr. Warren testified at length concerning the events that transpired in his life since his arrest in August of 1974. He demonstrated the deepest sense of regret and remorse for his past acts. It is clear that the events bringing about his discipline have caused an enormous amount of agonizing in his life. However, his moral character is displayed through his testimony about never wanting to give up hope, and continuing to do as much as he could in order to better himself and those around him during the trying times subsequent to his arrest.

Mr. Warren testified that he harbors no ill feeling towards those responsible for bringing about his discipline, and in fact feels he has been treated fairly throughout the process. His true sense of repentance was further bolstered and fortified by his firm commitment not to repeat these past acts but instead to reestablish himself as a productive and contributing member of society.

Mr. Warren has studiously avoided any possible activity that could even be remotely construed as violating the terms of his disciplinary order. He has taken affirmative steps on those occasions when such might be misconstrued. See Petitioner's Composite Exhibits A-22 and A-23.

Mr. Warren has zealously maintained and developed his legal skills and his current awareness of developments in the law. He has regularly read the Florida Bar News, The American Bar Association Journal, the weekly advance sheets of the Commerce Clearinghouse and Bureau of National Affairs on employment practices decisions and fair employment practices, the Florida Case Summary, the National Law Journal, and the advance sheets of United States Supreme Court opinions in Lawyers'

Edition 2d and stays current with the Florida Statutes and Florida Statutes Annotated. Mr. Warren further described how his work as a law clerk researching and writing various memoranda, briefs, motions and other documents has required him to maintain a current awareness in a great many areas of the law. He has continued his legal education through his enrollment at the Florida State University in a graduate level statistics course. It is abundantly clear that Mr. Warren has in fact done virtually everything he could in order to maintain his skills in the legal profession, and in fact has so maintained these skills at a very high level. His commitment and desire to remain in the legal profession as well as his present professional ability to do so were convincingly demonstrated through his testimony.

D. Letters.

The record includes over 35 letters of recommendation from attorneys, judges, community leaders, and friends. All of these persons were aware of Petitioner's conviction and suspension and his present efforts to gain full reinstatement to the Florida Bar. The undersigned has carefully read and considered every one of these letters and is firmly impressed by their sincerity, awareness, and unity of belief and confidence in Mr. Warren's present character as well as his professional ability.

These are not letters from persons who have had minimal or superficial contact with Mr. Warren over the past several years since his conviction and suspension. They are, instead, letters from friends and associates who have had the best opportunities to witness and observe the kinds of factors that must be considered in determining whether the Petitioner had rehabilitated himself and is presently fit to resume his full membership in the Florida Bar. Several letters were from supervising attorneys of Mr. Warren's who worked as associates at Spriggs & Henderson, P.A. Not a single person expressed any reservation about recommending full and immediate reinstatement to the Bar. Considering the unique opportunity these persons have had in observing Mr. Warren's behavior, and considering their own status in the community and/or the Bar, either as an attorney or judge, their support stands as a testimonial to the present character and professional ability of the Petitioner.

## V. CONCLUSION

The undersigned has thoroughly reviewed and considered the testimony and exhibits submitted by the Petitioner.[11]

---

[11]The Florida Bar presented no evidence and submitted no exhibits.

The undersigned has also reviewed the Supreme Court opinions establishing the elements which a suspended attorney must bear the burden of proving by clear evidence in connection with a petition for reinstatement. The leading case in this regard is *In re Dawson,* 131 So.2d 472 (Fla. 1961), reaffirmed in *The Florida Bar, Petition of Rubin,* 323 So.2d 257 (Fla. 1975); *In re The Florida Bar,* 301 So.2d 448 (Fla. 1974) and *Petition of Wolf,* 257 So.2d 547 (Fla. 1972).

These decisions established the following elements necessary for reinstatement:

(1) Strict compliance with the specific conditions of the disciplinary order.

(2) Evidence of unimpeachable character and moral standing in the community.

(3) Clear evidence of a good reputation for professional ability.

(4) Evidence of a lack of malice and ill feeling towards those who by duty were compelled to bring the disciplinary proceeding.

(5) Personal assurances, supported by corroborating evidence, revealing repentance and desire to conduct himself in an exemplary fashion in the future.

(6) In cases involving misappropriation of funds, restitution.

*In re Dawson, supra,* at p. 474.

The undersigned has carefully and thoroughly studied these cases. In so doing, I have noted the various factual situations in which the Supreme Court has found that the various petitioners in those cases had met their burdens of proving the elements necessary for reinstatement. In light of these holdings, my conclusions are inescapable. My review of the evidence presented in these cases, compared with that which I have carefully weighed in the instant case, leads me to the conclusion that the clear evidence standard has more than been met and that each required element has been proven overwhelmingly. It would be difficult for me to envision an individual who had demonstrated rehabilitation and present fitness to practice law more than the instant petitioner. This includes all respects: personal life, community life, but most particularly professional life.

Working as a law clerk in a law office is a grinding process. It can be exciting on occasions. It can be fascinating. It can be fulfilling, but it is still serving as a law clerk, which is a subordinate position, and one in

which one does not occupy full collegial status with those that he works with. It is my finding that the rehabilitation process as it relates to Mr. Warren's current professional ability has been clearly and convincingly established at the highest limits of exemplary. I am personally acquainted with Mr. Spriggs and his practice. It is a practice that furnishes a great number of needy people in our society with representation, and it is representation that is furnished, in my personal estimation, of the highest quality. I have litigated against Mr. Spriggs in the past, and through personal experience I can assure anyone who wants to know that he is a formidable opponent. I have also found my skirmishes in litigation with him to be conducted, insofar as he and I have been concerned, on a very high level. For Mr. Warren to have had an opportunity to perform the duties of a law clerk with a firm that practices that level of quality control, self education and current awareness in the profession was indeed a very fortuitous event.

I have carefully reviewed the documents which were submitted into evidence by Petitioner. Included within these are representative samples of Mr. Warren's supervised workproduct which he produced during the various years of his suspension. This work demonstrates the highest quality of scholarship, and one which any active and practicing member of the Bar would be proud to claim as his or her own. In reviewing the various documents included within Petitioner's Composite Exhibit A-29A-29H I have had an opportunity to review the legal analysis, writing ability, and insight into this individual's current awareness of the law in a myriad of legal areas. Again, I find that this awareness is at the highest levels of exemplary.

In listening to the testimony and evidence presented concerning the opportunity and duties which Mr. Warren has experienced relative to the complex federal litigation, including *Stallworth v. Monsanto,* I find that no better opportunity could ever have been presented in which an individual could continue to maintain and hone his legal skills. The opportunity to be involved in litigation of this sort from the ground floor up, including steps relating to discovery, preparing witness and class member testimony for trial, preparing exhibits for trial, and drafting proposed findings of fact and conclusions of law, post-trial, was very fortuitous. Mr. Warren has clearly taken advantage of this situation and demonstrated his desire and ability to maintain and develop his legal skills.

I have observed the demeanor of Mr. Warren throughout these proceedings and physical observations I have with respect to his attitude and other intangible factors lead me to the conclusion that his past

actions towards rehabilitation and his present motivation in these proceedings is very, very high. I have also observed the demeanor of those who have appeared as witnesses, the sincerity of their testimony, and the obvious conviction with which they testified. I likewise find their testimony not only to be highly credible, but very affirming of the conclusions that I have reached. I also note that all of that testimony has touched on the salient criteria set forth in the decisions above as being the ones which must be taken into consideration. Again, this evidence has proven to be of an overwhelming nature.

Two recent opinions of the Supreme Court further compel the conclusions and recommendations I have reached. *In re Petition of Diez-Arguelles,* 401 So.2d 1347 (Fla. 1981) and *The Florida Bar, re Efronson,* Case No. 59,025 (July 10, 1980) (Opinion unreported) have been carefully considered by me in reaching my conclusions and recommendations. In *Diez,* the Supreme Court found that an individual who had been convicted of two sales of cocaine (and had admitted to 15 others) had proved that he had rehabilitated himself. The Supreme Court noted several accomplishments in the petitioner's life which had demonstrated this individual's rehabilitation, finding that they:

> . . . demonstrate a desire to improve himself, acceptance of certain responsibilities and goals, and persistence in achieving the same. Petitioner has evidenced a resolve to chart a new course to his life, renouncing the element in which he was enmeshed.

> Also indicating the petitioner's sincere and successful drive for rehabilitation are the letters from and testimony by professionals with whom he has dealt since his conviction. They reflect petitioner's special efforts to avoid any kind of trouble, his diligence and dependability in all undertakings, his regret concerning his past conduct and attempts to warn others against such mistakes, and what those who have dealt with him view as his high moral standards and integrity . . .

> Petitioner has demonstrated that he meets those standards. He has shown by hard work, perserverance, and dedication a reformation. We would be hard pressed to find a person who has worked harder to overcome a regretable course of conduct; one who chose the route of improvement and rehabilitation through hard work rather than the too often chosen path of a continued life in crime. One who works diligently at rehabilitation and who can show that he has in fact been rehabilitated,

should not be denied the privilege to practice law solely because of a past mistake which is no longer relevant to the issue of admission to the Bar.

*Id.,* at pp. 1346-1348.

I have compared those facts and factors considered by the Supreme Court in *Diez* to those in the instant case. Because I find that the instant evidence is at least as compelling if not more compelling than that in *Diez* my conclusion is inescapable. "[I] would be hard pressed to find a person who has worked harder to overcome a regrettable course of conduct." *Ibid.*

*The Florida Bar re Efronson, supra,* provides similar guidance. In *Efronson,* the petitioner had been convicted of conspiracy to counterfeit, a felony under the laws of the United States. He had been suspended from the practice of law for nearly six years. At this hearing before the referee, three attorneys, in addition to the petitioner, testified on his behalf. The Supreme Court found that:

> . . . They expressed the highest opinion of his honesty, integrity, and reputation as an attorney and in the community. They were "shocked at his conviction," and recommended that petitioner be reinstated. Petitioner testified that he maintained a large law library and read the advance sheets as well as the session laws. An attorney testified that, from his personal observation, petitioner had kept up on developments in the law and that he would make a most worthy and credible member of the Bar should he be permitted to practice once again.

*Id.,* at p. 1.

As in the instant case, petitioner in *Efronson* submitted numerous letters of recommendation from various persons both within and without the legal profession. Many of these letters "attested to petitioner's reputation as a capable and competent attorney and as to his high standard of integrity and morality". The Supreme Court, after reviewing these factors, held that:

> The referee concluded petitioner has clearly met the burden of proof in establishing all of the elements applicable for reinstatement. We adopt the recommendations of the referee and grant the petition for reinstatement. Petitioner is hereby

reinstated to the Florida Bar and is not required to take any examination.

*Id.,* at p. 2.

As in *Efronson,* the instant petitioner has produced convincing, overwhelming, and uncontroverted evidence as to his present character and his present professional ability. As in *Efronson,* the petitioner in the instant case has experienced a relatively lengthy suspension. But the instant petitioner has, unlike the petitioner in *Efronson,* not only maintained his current awareness of the law through reading various legal publications, etc. but he has also actually maintained *and* improved his legal skills by his employment as a law clerk during his suspension. This is extremely notable, and bears significantly on my finding that Mr. Warren is currently professionally qualified to resume full membership in The Florida Bar.[12]

The crimes in *Efronson, Diez,* and the instant case were serious offenses. They should not be made light of. However, I feel that it is important to note that none of these crimes involved clients, nor did they involve issues of trust.

It has been over seven years since Mr. Warren's arrest and over five years since his suspension. The clear and convincing evidence presented in this proceeding has established that Mr. Warren:

> . . . has so conducted himself personally and in the life of his community to justify a conclusion that he has repented of his misdoings, that the disciplinary order has impressed him with the vital importance of ethical conduct in the practice of law, and that he is morally equipped to resume a position of honor and trust among the ethical practitioners at the Bar.

*In re Dawson, supra,* 131 So.2d at 474.

---

[12]During his suspension, the Petitioner in *Efronson,* unlike Mr. Warren, was not employed with a law firm. Instead he worked in real estate and investments. See *The Florida Bar,* re *Efronson, supra,* Referee's Report of May 12, 1978 at p. 2, supplemented on February 12, 1980 at p. 2. He did, however, maintain an awareness of current developments in the law through reading various legal publications. However, since Mr. Warren has been employed as a law clerk in a law firm and has also read the same types of legal publications as did petitioner in *Efronson, a fortiori,* the conclusion is inescapable that Mr. Warren's awareness of current developments in the law and his professional ability have been established beyond that required by *Efronson.* Therefore, I find, as did the Supreme Court in *Efronson,* that it is unnecessary for Mr. Warren to retake the Bar examination.

It is my further finding that Mr. Warren had shown the requisite level of rehabilitation several years ago, as found by Judge Aronovitz in his well reasoned Order of November, 1980. Petitioner's Composite Exhibit A-25. But for the unprecedented four years that his appeal remained in the Fifth Circuit for two rehearings *en banc,* Mr. Warren would have completed his sentence and been eligible for reinstatement several years earlier. Mr. Warren is to be commended for the manner in which he has accepted and utilized his time and abilities during this lengthy period of suspension.

It is my further finding that Mr. Warren through his work as a law clerk for the last five years and through his personal efforts above and beyond his employment has maintained and improved his professional legal abilities and kept up to date with current developments in the law. Mr. Warren's professional legal ability was demonstrated to be of a sufficiently high quality that there is no need for him to be required to retake and repass the Bar examination.

The tangible and intangible suffering that he experienced, above and beyond the eventual relatively short period of incarceration, has been high. He has proven himself absolutely and totally fit in every respect to now return to active and full membership in The Florida Bar. I find that there is no reason whatsoever for any further delay in returning Mr. Warren back to full and complete membership in The Florida Bar, where he can continue to be a productive and worthy member of society as well as The Bar.

## VI.   RECOMMENDATION.

On the basis of the foregoing finding and conclusions, the undersigned referee respectfully recommends:

1.  That the Petition be granted and that the Petitioner be reinstated forthwith as a member in good standing of the Florida Bar.

2.  That the Petitioner not be required to take the Bar examination.

3.  That the costs of these proceedings be taxed against Petitioner.